[Civ. No. 1722.   Third Appellate District.—October 20, 1917.]

EVA MARKS, Administratrix of the Estate of Harry Marks, Deceased, Respondent, v. M. REISSINGER, Appellant.

ACTION FOR DEATH—ASSAULT AS CAUSE—CONFLICT OF EVIDENCE—VERDICT NOT DISTURBED.—The record disclosing a substantial conflict in the evidence as to whether the defendant struck the deceased without cause or not in necessary self-defense, and also as to

wL·ther death was caused by the blows alleged to have been struck, the verdict awarding damages cannot be disturbed on appeal.

Id.—Statute of Limitations—Time for Commencement of Action.— The time for bringing an action of this character begins to run from the time of the death of the injured person, and not from the time the injury causing his death was inflicted upon him.

Id.—Right of Action of Heirs—Failure of Deceased to Sue.—The right of heirs and representatives to sue under section 377 of the Code of Civil Procedure is not affected or barred by the failure of the deceased to sue in his lifetime.

Id.—Evidence—Inadmissibility of Declarations of Deceased.—The right of action given to heirs or personal representatives by section 377 of the Code of Civil Procedure is a new right of action distinct from that which accrued to the injured person as a result of the defendant's wrongdoing, and therefore declarations of the deceased to the effect that he was not struck or injured by the defendant are inadmissible, and objections to evidence of such declarations as hearsay are properly sustained.

Id.—General Reputation for Peace and Quiet.—Testimony as to the general reputation of a person should be based upon the result of the knowledge of the witness of such general reputation and not upon specific acts tending to show a good or bad character which have come under the personal observation of the witness.

Id.—Instructions—Burden of Proof—Justification for Assault as a Defense.—The jury were properly instructed to the effect that there is no legal presumption that a bodily injury is justifiable, and the justification therefor, if any, must be proven by him who asserts it.

Id.—Cause of Death—Pneumonia Concurring With Injuries.—It is not the law that, to hold a wrongdoer for his tortious act whereby he produces damage to, or the death of another, such act must be the *sole* proximate cause of the injury or death, and therefore an instruction that if the jury believed from the evidence that after the assault and prior to his death the deceased contracted pneumonia, and that cerebral meningitis, as a result of the assault, "proximately concurred with said pneumonia in causing his death, and that said death would not have occurred at said time from pneumonia alone," the verdict must be in favor of the plaintiff, correctly states the law.

APPEAL from a judgment of the Superior Court of the County of Yuba, and from an order refusing a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

W. H. Carlin, for Appellant.

Jeremiah F. Sullivan, Sullivan & Sullivan, Theo. J. Roche, E. I. Barry, and J. E. Ebert, for Respondent.

HART, J.—The action was brought by plaintiff as administratrix of the estate of her husband, on behalf of herself and her three minor children, to recover damages for the death of her husband, alleged to have been caused by blows wrongfully inflicted upon him by defendant. The jury returned a verdict in favor of plaintiff in the sum of ten thousand dollars, and judgment was entered accordingly. The appeal is by defendant from said judgment and from an order denying him a new trial.

Briefly, the facts of the case may be stated as follows: Harry Marks, the deceased, was the owner of a number of work horses with which he engaged, in the summer months, in the business of logging in Plumas and Sierra counties and, in the winter months, in plowing for different parties in Yuba and Butte counties. In March, 1912, he was engaged in plowing some land about six and one-half miles from Marysville and had spent the night of March 12th with his family in Marysville. On the morning of the 13th of March, George W. Hughes, a brother of Mrs. Marks, who was employed by Harry Marks, drove into Marysville with a four-horse team for the purpose of securing supplies for the men and teams. He was accompanied by a man named Frank Robinson and another named Petrie. Late in the afternoon, these three men, accompanied by Marks and a man named Craig, started to drive back to the place where they were working. Some of the party had been drinking during the day and Hughes testified that Robinson and Craig were "pretty drunk" and that Marks and Petrie were sober. When the party arrived at the saloon and brewery owned and conducted by the defendant, Robinson, desiring another drink, alighted from the wagon and started toward the saloon. He became engaged in a controversy with Herman Fehr, an employee at the brewery, which soon became a scuffle. Marks remarked that he was "going in to get Mr. Robinson," and went to where the two men were. Shortly afterward Hughes followed him and he testified that Robinson and Fehr were scuffling and that Marks was standing by looking on. He

said that Fehr had Robinson down on the floor and the latter "hollered 'Enough,' and Mr. Marks stepped over and said, 'Humpy, Frank says he has got enough,' and just then a man hit Harry three times over the head with a billy and kind of staggered him down and a fellow named 'Red' Quinlan hit Harry and knocked him clean down and he got up and the fight kind of stopped and the fellow that hit him with the billy run into the building, into the saloon, I judge. . . . Mr. Marks was struck with a billy on the left side of his head." The man who struck the deceased with the "billy," which was shown by the evidence to be a piece of rubber hose, was the defendant.

Dr. J. H. Barr attended deceased from the 14th of March, 1912, until his death, which occurred on the first day of May following. He testified that Marks complained of pains on the left side of his head. After his death he performed an autopsy upon the body. He testified: "An incision was made, removing the scalp, and on the removal of the scalp on the left side of the head, . . . located about halfway between the top of the head and the median line was a blood extravasation below the periosteum. . . . We found the membrane thickened and congested and adhered to the brain. . . . We found the brain lacerated and infiltrated with pus. . . . I would say trauma was the cause of the conditions I observed and found in the head of Harry Marks on this occasion. By 'trauma' I mean violence. . . . A blow of any kind could inflict that; a fall could also inflict it; but the individual would have to fall with his head downward to inflict it in that place." Dr. Barr stated that the cause of the death of Marks "was injury to the skull—I will get it properly worded. Injury to the head; laceration of the brain on the left side." He said that the injury was to the left of the median line and on the left side of the head.

Dr. David Powell, who assisted Dr. Barr in the autopsy, corroborated the latter as to the conditions in the head and brain and the cause of Marks' death.

The first assignment of error is that the evidence is insufficient to sustain the verdict of the jury.

1. While we deem it unnecessary to recite herein in detail the testimony of the various witnesses, we may nevertheless properly refer to some of the testimony in a general way for the purpose of showing that there is a sharp conflict in the

evidence upon the material points in the case, and that there-
fore the verdict of the jury must stand.  In the first place,
it may be remarked that it is to be conceded that the testi-
mony of the witnesses for the defendant that were present
at the time of the trouble and claimed to have witnessed it
tended to show that a general row, started by the man Rob-
inson, above referred to, was in progress in the brewery and
that the deceased was mixed up in it; that the defendant
ordered the men to cease making a disturbance in his place;
that the defendant procured a piece of hose and again stepped
up to the fighting men and ordered them to stop fighting;
that the deceased made some remark to the defendant and
also made a demonstration as though he intended to assault
him, whereupon the defendant struck the deceased with the
said piece of hose several times on the shoulder, not with
sufficient force, however, to knock him down or to the floor;
that thereafter the deceased went on the outside, picked up
a heavy stick and threatened to "settle" with the defendant;
that thereupon one Quinlan, with his fist, struck Marks twice
—once in the mouth or side of the neck and once in the nose.
The defendant testified that he had in the saloon a piece of
hose about two and one-half inches in diameter, which he
kept there for the purpose of "protecting himself." He
admitted striking the deceased with the hose, but denied that
thus he struck him on the head.

There was further testimony (given by Dr. Barr) that,
after the deceased was injured at the brewery, he was taken
down with pneumonia from which Dr. Barr declared he had
entirely recovered, serious symptoms from the effects of the
blows upon his head having shortly thereafter manifested
themselves.

Dr. Kaufman, for the defendant, testified that he was
present and witnessed the autoptical examination of the de-
ceased by Drs. Barr and Powell, and declared it to be his
opinion that Marks' death was not the result of any injury
to his head or brain, but was directly caused by pneumonia.

Thus it will be noted that, as stated, there is a pronounced
conflict in the evidence upon the two important questions
of fact in the case, viz.: 1. Whether the defendant, without
cause or not in necessary self-defense, struck the deceased
on the head with the piece of hose; 2. Whether the cause of
Marks' death was from the effect of the blows so delivered by

the defendant. It is true that but one witness (Hughes) testified that the blows delivered by the defendant were upon the head of the deceased when the latter was doing no more than attempting to stop the fight or scuffle going on between Fehr and Robinson, and that, prior to being so struck, the deceased had made no hostile or threatening movement or demonstration toward the defendant. The defendant's witness, Hardy, it might be well to explain in this connection, admitted that he told the attorneys for the defense and Mrs. Marks, the plaintiff, in the office of said attorneys, prior to the trial, that he saw the defendant strike the deceased on the head with the hose; but he further declared that he then made that statement because he had been asked by the plaintiff's attorneys to call at their office, and that he desired to see precisely what they (the attorneys) wanted him for or wanted him to say when giving his testimony. He positively and thus repeatedly declared, though, that said attorneys at no time asked him to testify to anything concerning the case which was not true. But, throwing out of the case any consideration of Hardy's testimony or any suggestion that the jury might have believed that he told the plaintiff's attorneys the truth when he said to them that the defendant struck the deceased on the head with the hose, and still there stands unimpeached in the record Hughes' testimony which, if believable, is amply sufficient to sustain the verdict. His testimony is not upon its face improbable. The fact that he is a brother of the plaintiff obviously does not make it so. It might have entered into the question of his interest in the case in behalf of the plaintiff, and thus his credibility and the weight of his testimony affected, but this was for the jury to resolve. The latter having evidently, and, indeed, presumptively, believed his testimony as to the circumstances of the assault, as well as the testimony of Drs. Barr and Powell as to the cause of Marks' death, it is manifestly not for a court of review to say, in view of the character of said testimony or the face value thereof, that the conclusion arrived at by the jury was not justified, notwithstanding that the record discloses that a number of other persons, claiming to have witnessed the assault, gave testimony which, if accepted and believed by the jury, would certainly have had the effect of completely destroying its evidentiary force and value.

There is, as seen, real and substantial evidence in the record on the material points in the case to support the verdict, and this is all that is required to foreclose interference with the verdict on the ground that it was not justified by the proofs. (*Driscoll* v. *Cable Ry. Co.*, 97 Cal. 533, 562, 567, [33 Am. St. Rep. 203, 32 Pac. 591] ; *Clayton* v. *Clayton*, 162 Cal. 31, [121 Pac. 720] ; *Lummer* v. *Unruh*, 25 Cal. App. 102, [142 Pac. 914] ; *Hecker* v. *Morley*, 170 Cal. 88, [148 Pac. 516] ; *Clark* v. *Tulare Dredging Co.*, 14 Cal. App. 414, 429, [112 Pac. 564].)   It may be added that, since the answer of the defendant set up, as a defense to the action, the fact that the defendant struck the deceased as in necessary self-defense or to protect himself against threatened personal injury at the hands of the deceased, the burden rested upon the defendant to establish that defense (*Brooks* v. *Haslam*, 65 Cal. 421, [4 Pac. 399] ; *Chapell* v. *Schmidt*, 104 Cal. 511, [38 Pac. 892] ), and the jury were the exclusive judges of whether this burden was sustained.

The other assignments of error involve the rulings of the court upon the evidence, certain instructions embraced in the court's charge, and the ruling disallowing the demurrer on the ground that the action was barred by the terms of subdivision 3 of section 340 of the Code of Civil Procedure. The latter proposition, although the last assignment of error discussed in the briefs, may first be appropriately considered, since it goes to the question whether the plaintiff's action was lost by lapse of time.   Moreover, the principle to be considered and applied in the determination of the question whether the action was brought after it was barred under the statute has direct relation to and will govern in the decision of the point, advanced by the defendant, that the court erred in refusing to permit a certain declaration of the deceased as to the assault to go before the jury.

2. The contention is that the time for the commencement of this action began to run from the time the deceased received the injuries which, it is alleged, caused his death, and that, when this action was instituted, more than one year had elapsed since the injuries were received, section 340, subdivision 3, providing, among other things, that an action for injury to or for the death of one caused by the wrongful act or neglect of another must be brought within one year from the time of such injury or death.   The theory involved in

the demurrer on the special ground necessarily is that the right of action which the plaintiff is here claiming is precisely the same or identical action which accrued to the deceased by reason of the injury suffered by him from the alleged wrongful act of the defendant. The theory is plainly erroneous. The right of the deceased to maintain, in his lifetime, an action for the damage, if any, sustained by him at the hands of the defendant, and the right of the heirs or personal representatives of the deceased, after the latter's death as the result of such injury, to maintain an action for the death of Marks so caused, are two entirely different rights. Obviously, the right of the deceased to maintain an action for damages for the injuries received necessarily expired with his death. *Actio personalis moritur cum persona;* and but for the law giving to the heirs or representatives of the deceased the right to sue for such damages as they may have sustained by reason of the death of Marks through the alleged wrongful act of the defendant, the latter (Marks having died before bringing any action) would be wholly immune from any action or the consequences thereof of a civil nature. Our law (Code Civ. Proc., sec. 377) giving the heirs or personal representatives of a deceased person a right of action for his death, wrongfully produced through the act of another, was not known to the common law. It is purely a statutory right —a right with which, very clearly, the person for whose death the action may be maintained could possibly have no concern. It ought not to be necessary to say that the right does not, and, in the very nature of things, could not under any possible view, exist during or in the lifetime of the person wrongfully injured; for the very fact of his death from wrongful violence at the hands of another itself or alone creates or establishes the foundation for the exercise of the right to sue for any damages suffered by his heirs, etc., for his death so caused. To hold, as the learned counsel maintains, that the right of action after death is only the succession in the heirs or personal representatives of the right as it existed in and belonged to the deceased before his death, would be to hold that the right of action in the heirs lies solely in the damages suffered by the deceased by reason of the injuries received. This would involve a most unreasonable view of section 377. As stated, the damage for which the heirs or personal representatives of a deceased whose death has

been caused by the wrongful act of another may maintain the action authorized by said section lies necessarily in the fact of such death. What damage, in law, could a person himself suffer by reason of his own death caused by the tortious act of another? Obviously, no damage whatever. But the language of the section mentioned is itself plain and simple enough to show that the intention of the legislature, in enacting it, was to give to the surviving heirs of the deceased who may themselves be damaged by his death in a wrongful manner the right to sue for compensation for the damage so sustained. The section reads: "When the death of a person not being a minor is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death," etc.

Nor does the fact, if it be a fact, that the deceased did not bring an action in his lifetime for the damages occasioned to him by the injuries inflicted upon him bar the right of the heirs or personal representatives of the deceased to exercise and prosecute their right of action under section 377.

The above views accord with the authorities. We quote the following from Tiffany on "Death by Wrongful Act," section 23: "It is manifest that the act did not repeal, or create an exception to, the rule of '*actio personalis moritur cum persona*' by providing for the survival of the action which the party injured might have maintained; for, though the action can be maintained only when the death is caused under such circumstances as would have entitled the party injured to maintain an action, it is not maintainable for the recovery of the damages resulting from the personal injury to him, and hence, by survival, to his estate; but *is maintainable only for the recovery of damages for the pecuniary loss resulting from the death to the surviving members of his family.* As Coleridge, J., said in one of the first cases that arose under the act: 'This act does not transfer the right of action to his representative, but gives to his representative a totally new right of action, on different principles.' · It must be admitted that expressions occur in some of the opinions to the effect that the statute gives a substituted, and not a new, right of action, but, having regard to the provisions of the act in respect to the persons who are entitled to the benefit of the action and the measure of damages, such a

position is entirely untenable. Said Lord Blackburn, in
*Seward* v. *The Vera Cruz:* 'A totally new action is given
against the person who would have been responsible to the
deceased if the deceased had lived—an action which . . . is
new in its species, new in its quality, new in its principle, in
every way new, and which can only be brought if there is
any person answering the description of the widow, parent,
or child, who, under such circumstances, suffers pecuniary
loss.' "

The supreme court, in *Munro* v. *Pacific Coast D & R. Co.,* 84
Cal. 515, 524, [18 Am. St. Rep. 248, 24 Pac. 303, 305], said,
referring to what was said in the English case of *Blake* v.
*Midland Ry. Co.,* 18 Q. B. 93: "We agree with what is said
in the opinion above quoted, that the action given by the
statute (section 377, *supra*) is a new action, and not the
transfer to the representatives of the right of action which
the deceased person would have had if he had survived the
injury," citing a number of English and American cases.
(See, also, *Lange* v. *Schoettler,* 115 Cal. 388, 390, [47 Pac.
139]; *Burk* v. *Arcata & Mad River R. R. Co.,* 125 Cal. 364,
366, 367, [73 Am. St. Rep. 52, 57 Pac. 1065]; *Gregory* v.
*Southern Pacific Co.,* 157 Fed. 113; *Webster* v. *Norwegian
Min. Co.,* 137 Cal. 399, [92 Am. St. Rep. 181, 70 Pac. 276];
*Western & A. R. Co.* v. *Bass,* 104 Ga. 390, [30 S. E. 874];
*Causey* v. *Seaboard Air Line R. Co.,* 166 N. C. 5, [Ann.
Cas. 1916C, 707, L. R. A. 1915E, 1185, 81 S. E. 917].)

From the foregoing considerations, it follows, of course,
that the time for bringing an action of this character begins
to run from the time of the death of the injured person
and not, as counsel for the defendant contends, from the time
that the injury causing his death was inflicted upon him.
The deceased died on the first day of May, 1912, and this
action was commenced on the twenty-third day of April, 1913.
The action was therefore brought within the statutory time,
and the demurrer upon the ground that it was barred by the
section named was properly overruled.

3. As stated, the next assignment of error involves a ques-
tion closely akin to the proposition above discussed. It came
about thus: The witness, Mandry, for the defendant, was
asked by the latter's counsel about an alleged conversation
the witness had with the deceased, a few days after he re-
ceived the beating by the defendant, to which question an

objection was made by the plaintiff and sustained by the court. Thereupon counsel for the defendant stated that he desired to prove by the witness that in the conversation referred to Marks declared that the defendant did not strike him on the head. Objection to the proposed testimony was interposed by the plaintiff on the usual or ordinary grounds and, furthermore, that it was hearsay, and the objection sustained. We think the ruling was correct.

As above shown, the right of action asserted here by the plaintiff was not a right of action of the deceased. It arose independently of any consideration of the deceased's right to maintain and prosecute an action in his lifetime for any damages he might have suffered because of the injury inflicted upon him by the defendant. The right of his heirs or representatives to maintain this action for his death and to support the same by evidence could not be destroyed by any compromise or agreement of release he might have made with the defendant while his right of action existed. Or, as the supreme court has recently said, referring to the action created by section 377—we quote the syllabus: "The right of action thereby created is a new right of action with a different measure of damage from that which accrued to the injured person as the result of the defendant's wrongdoing, and a compromise agreement and release of the wrongdoer made by the injured person before his death is not a defense thereto." (*Earley* v. *Pacific Elec. Ry. Co.*, 176 Cal. 79, [167 Pac. 513].)

By parity of reasoning, the declaration of the deceased after he received the injuries and before his death, that he was not struck and injured by the defendant, cannot be used for the purpose of defeating the heirs or representatives of the deceased in an action which is theirs and never his. The declaration was not admissible under the rule allowing declarations of a deceased person against his pecuniary interest or that of his successor in interest (Code Civ. Proc., sec. 1853); for, as has been shown, he never had any interest in the present action or the subject matter thereof, nor are his heirs or representatives, in an action of this character, his successors in interest. Nor was it admissible as part of the *res gestae*. The whole theory upon which such declarations are excluded in a case of this character is, as above suggested, that the legal rights of the heirs or representatives of

a deceased person seeking to recover for his death resulting from the wrongful act of another, while growing out of the injury causing the death, are independent of that fact, and cannot be defeated or affected by anything the deceased can say or do. This proposition is clearly explained in the cases, among which we cite the following: *Hedge* v. *Williams,* 131 Cal. 455, [82 Am. St. Rep. 366, 63 Pac. 721, 64 Pac. 106] ; *Pennsylvania Co.* v. *Long,* 94 Ind. 250, 252; *City of Bradford* v. *Downs,* 126 Pa. 622, [17 Atl. 884] ; *Louisville etc. Ry. Co.* v. *Berry,* 2 Ind. App. 427, [28 N. E. 714].)

4. The next assignment involves an attack upon the action of the court in striking out a portion of an answer to a certain question put to the defendant by his counsel. The defendant, after explaining that, when Fehr and Robinson were scuffling on the floor, he attempted to stop the fight, and said to the belligerents that he did not "want any trouble here," was asked by his attorney, "What did Marks do or say then?" to which he replied: "He said, 'You Dutch s—n-of-a-b—h, if you don't let them have it out I will get you,' and I would have stopped it there if it had not been for Marks." The court, on motion, struck out the following portion of the answer: "I would have stopped it there if it had not been for Marks." The ruling is not erroneous. The portion of the answer stricken out involved the mere opinion and conclusion of the witness, and its vice was in its insinuation, without explaining or describing his acts or conduct so that the jury could have determined that question, that Marks was taking a hand in the trouble or encouraging it.

5. Again, it is said that the court erred to the prejudice of the defendant's rights in the trial by striking out the following explanation by the defendant of his reason for keeping in his saloon the piece of hose with which he struck the deceased: "I am out there and I have no one's protection whatever and I thought I had a right to protect my place there." Although we think the ruling was proper, the statement stricken out might have been allowed to stand without jeopardizing the rights of the plaintiff or contributing to the advantage of the defendant. The hose was in his saloon and he admitted using it on the deceased, and, manifestly, the fact that he kept it there to protect himself or that he was without protection except such as he might himself personally invoke when necessary could have no tendency to excuse his

act in striking Marks. There was no claim in this case that he was anticipating trouble with Marks and his companions on the day of the difficulty or at any other time, and that he had procured the piece of hose for the special purpose of meeting such trouble or of assaulting Marks. The statement that he was without protection (presumably police protection) was clearly irrelevant and immaterial. That fact would not, of course, justify him in taking the law into his own hands or in wrongfully assaulting another.

6. As seen, the defendant testified that he did not use the hose on the deceased until the latter "had swung at him." He was then asked: "And when you did use it, did you use any more force than you felt necessary there to cause him to cease attacking you?" We think the form of the question is objectionable, yet, if he had been asked the question whether or not he believed, from all appearances, that he had used no more force than was necessary to cause the deceased to cease attacking him, the question might have been proper, in which case, after all, it would have been for the jury to say whether the force used by the defendant was greater than was necessary to stop the deceased from further prosecuting his attack upon the former. But, in any event, even if the ruling involved error, we cannot say that it was prejudicial, since the general trend of the defendant's testimony was that he acted in self-defense, and used no more force in repelling the attack of the deceased than was absolutely requisite for his own protection and safety.

7. The following questions to the defendant by his attorney were objected to as incompetent, irrelevant, immaterial, and leading, and the objection sustained: "Did you hit him or attempt to strike him until he first swung at you?" "Who made the first hostile demonstration there, Marks or you?" To the latter question the additional objection was made that it called for the conclusion of the witness. Undoubtedly the objections that the questions were leading in form and suggestive of the answer desired were well taken, and the exclusion of answers upon that ground, though a highly technical ground, was legally justified. Even though the court could properly enough have allowed the questions to be answered and should have done so, yet it is to be said that the record shows that the defendant received the benefit of the testimony which they would probably have elicited;

for, in another part of his examination, he was asked if he used the hose before Marks "swung at you," and he answered, and the answer was allowed to remain in the record, "No, sir; no, sir." This was the equivalent of saying that the deceased made a hostile or threatening demonstration toward him before he used the hose; and it was, furthermore, the equivalent of saying that he did not "hit him [Marks] or attempt to strike him until he [Marks] first swung" at the defendant. And there can be no doubt that the jury so understood the answer to that question.

8. Several witnesses were introduced by the defense to testify that the general reputation of the deceased for peace and quiet was bad. While some of these witnesses, after considerable questioning and repeated explicit explanations by the court of what was meant by the term, "general reputation," as it is understood in law, were made to say, on direct examination, that they were acquainted with the general reputation of the deceased for the traits mentioned, and declared it to be bad, on cross-examination it was developed that they had based their statement that his general reputation was bad in the respect mentioned entirely on their own observations of his personal conduct on occasions when the decedent was under the influence of intoxicating liquor and not on what the community generally had said of him. The court, upon motion, struck from the record all such testimony, and technically the court thus made no mistake. It is well understood, of course, that the purpose of testimony of the general reputation of a person in the community in which he resides and is known for certain traits is to prove that his character is good or bad, as the case may be. Proof of character in that manner involves an exception to the rule against hearsay evidence. It is not an uncommon circumstance that such testimony may itself have the effect of turning the scale on a vitally important question of fact involved in the issue to be decided. Hence, the rule as to the mode of presenting such testimony or of proving character should, with substantial strictness, be observed, and to this end testimony of specific instances of misconduct, where bad character is sought to be shown, should no more be allowed than testimony of particular instances of commendable conduct, where good character is attempted to be established. In other words, testimony addressed to the question of the general reputation of a per-

son as to certain traits of character should, as the law requires, be based upon and the result of the knowledge of the witness of such general reputation, and not upon specific acts tending to show a good or bad character which have come under the personal observation of the witness.

9. Relative to the complaint that the court erred in some of the instructions embodied in its charge to the jury, counsel for the defendant, in his brief, says: "Under this heading ('Errors Claimed in Connection With the Giving of Instructions'), we will group certain assignments of error which we deem it our duty to present and concerning which we make no waiver, as we believe they should be passed upon by the court, but in the discussion of which we cannot indulge the same earnestness of conviction attempted to be asserted in thus far presenting this case." Thus it plainly appears that counsel himself is not seriously of the opinion that the instructions to which he refers contain erroneous statements of legal principles, or that the principles so stated are not pertinent to the issues as made by the pleadings and developed by the evidence. There are, however, three instructions in the group mentioned in the above-quoted statement. One of these is to the effect "that there is no legal presumption that a bodily injury, if any, is justifiable; and the justification therefor, if any, must be proven by him who asserts it." We think the instruction, as applied to this case, states a legally sound principle. It simply means that, in a case of this character, where justification for the injury inflicted is set up as a defense, the burden is upon the defendant to prove the defense. This is as we understand the law and have elsewhere in this opinion so declared. The learned counsel says that he has no fault to find with the second instruction included within the group, and certainly we have none. It is therefore unnecessary to make further reference to it. The third and last instruction embraced within the group, it is insisted, is not only erroneous, but was prejudicial in its effect upon the defendant's substantial rights. It reads:

"If you believe from the evidence that on the thirteenth day of March, 1912, the defendant, M. Reissinger, without cause or provocation, wrongfully and negligently struck Harry Marks on the head with a piece of hose, and if you further believe from the evidence that as the result thereof

said Harry Marks suffered from cerebral meningitis, *and if you further believe from the evidence that after said thirteenth day of March, 1912, and prior to his death said Harry Marks contracted pneumonia, and that said cerebral meningitis proximately concurred with said pneumonia in causing his death and that said death would not have occurred at said time from pneumonia alone, then I charge you that under such circumstances if such shall have been shown by the evidence the plaintiff in this case is entitled to recover, and your verdict must be in her favor and against the defendant."*

It is the portion of the instruction in italics to which the defendant objects. We perceive nothing wrong in the instruction. If the deceased would not have died when he did but for the cerebral meningitis caused by the injuries inflicted by the defendant, then certainly the plaintiff would be entitled to recover, notwithstanding that pneumonia might have concurred with such meningitis in proximately causing death. We do not understand the law to be that, to hold a party for his tortious act whereby he produces damage to or the death of another, such act must be the *sole* proximate cause of the injury or the death resulting therefrom. If such a rule were sound, then, where the distinct acts of two different parties had concurred proximately to cause injury to or the death of another, neither would be liable. In this case, as we have seen, the deceased was taken down with pneumonia, a dangerous malady, after he had been injured by the defendant. Now, if the evidence was such as to warrant the conclusion that the deceased would not have died when he did if it had not been for the development of cerebral meningitis from the injury to his head and brain inflicted by the defendant, then it follows that such meningitis was at least a concurring proximate cause of his death, and for this the defendant is liable. The instruction complained of clearly enough states the principle as we understand and have explained it. But, in any view, the instruction could not have prejudiced the defendant, since it assumes that pneumonia was a concurring proximate cause of death, whereas there is ample evidence from which the jury could have found, with seeming justness, that the deceased had practically recovered from pneumonia and that his death was directly and solely

due to cerebral meningitis caused by the injuries wrongfully inflicted upon him by the defendant.

We conclude that we would not be justified from anything presented in the record before us in disturbing the result reached in the court below, and, accordingly, the judgment and the order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 17, 1917.