[L.A. No. 29878. In Bank. Dec. 1, 1971.]

CLIFFORD ELLIS KAPLAN, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

152

## Counsel

Frank L. Williams, Jr., Public Defender, John J. Resnick, James R. Goff and David W. Duncan, Deputy Public Defenders, for Petitioner.

Paul N. Halvonik, Charles C. Marson, A. L. Wirin, Fred Okrand, Lawrence R. Sperber, Karlton & Blease, Coleman A. Blease, Sheldon Portman,

Public Defender (Santa Clara), and Rose Elizabeth Bird, Deputy Public Defender, as Amici Curiae on behalf of Petitioner.

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, and Oretta D. Sears, Deputy District Attorney, for Respondent and for Real Party in Interest.

## OPINION

**MOSK, J.**—The dispositive question in this proceeding for writ of prohibition is whether the enactment of section 351 of the Evidence Code, declaring generally that "Except as otherwise provided by statute, all relevant evidence is admissible," operated as a legislative repeal of the "vicarious exclusionary rule" adopted by this court in *People v. Martin* (1955) 45 Cal.2d 755 [290 P.2d 855], which permits a criminal defendant to object to the introduction of evidence illegally seized from a third person. We conclude the Legislature did not intend to repeal the *Martin* rule, and defendant is therefore entitled to the relief for which he prays.

The facts of the case are essentially undisputed. On June 20, 1970, during daylight hours, Police Officer Briscoe observed a small sports car traveling at 45 miles per hour in a 25-mile-per-hour zone. The vehicle contained three persons: defendant occupied the passenger seat on the extreme right, and seated between defendant and the driver was a 16-year-old juvenile named Patterson. According to Officer Briscoe's testimony at the preliminary examination, when he turned on his red light to signal the driver to stop he saw Patterson look back, reach under the front seat, and put his hand inside his coat.

Officer Briscoe observed no other suspicious circumstances or unusual conduct by the occupants of the car. Nevertheless, on the theory that Patterson's "furtive movements" suggested he might be hiding a weapon, Officer Briscoe immediately ordered him to get out of the car and submit to a pat-down search. In the course of that search the officer felt a lump in Patterson's shirt pocket; although he was "pretty sure . . . it was not a weapon," he "had an idea it was pills." He thereupon placed Patterson under arrest for "suspicion of dangerous drugs," and reached into the pocket. It was found to contain a quantity of LSD tablets in a plastic bag. On cross-examination Officer Briscoe acknowledged that he had no warrant for Patterson's arrest or search; that he neither questioned the youth about possession of a weapon nor asked his consent to conduct the search; and that Patterson himself said nothing either before or after that search.

Patterson was called as a witness for the People, and declared that 10 minutes before the arrest he had purchased the LSD tablets in question from defendant. On cross-examination he testified it was the first time defendant had sold him narcotics, and conceded he gave the police a deliberately false description of defendant because he "didn't want to get involved at first." Patterson then admitted he had agreed to be a witness for the prosecution in exchange for a promise of immunity by the district attorney; he reiterated, moreover, that but for the promise of immunity he would not have testified against the defendant.

On this showing defendant was held to answer to a felony charge of selling a restricted dangerous drug. (Health & Saf. Code, § 11912.) His motion to suppress the evidence on the ground of unlawful search and seizure (Pen. Code, § 1538.5) was denied. His motion to set aside the information for lack of probable cause (Pen. Code, § 995) was likewise denied, and he seeks review of that ruling by statutory writ of prohibition (Pen. Code, § 999a).

To begin with, it is not disputed that the warrantless arrest and search of Patterson and the seizure of the contraband on his person were illegal. The trial court assumed this to be so, and the People do not contend otherwise.[1] Thus the "furtive gesture" observed by Officer Briscoe did not, without more, give him reasonable grounds to believe Patterson was in possession of a weapon. (*Gallik* v. *Superior Court* (1971) 5 Cal.3d 855, 861-862 [91 Cal.Rptr. 693, 489 P.2d 573]; *People* v. *Superior Court* (1970) 3 Cal.3d 807, 828-831 [91 Cal.Rptr. 729, 478 P.2d 449].) ■■ The discovery of the unidentified lump in Patterson's shirt pocket during the pat-down search did not justify further intrusion into that pocket for the purpose of self-protection, as Officer Briscoe knew the soft object was not in fact a weapon. (*People* v. *Collins* (1970) 1 Cal.3d 658, 662-663 [83 Cal.Rptr. 179, 463 P.2d 403]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 394 [82 Cal.Rptr. 379, 461 P.2d 659].) Nor could that rule be evaded by the device of arresting Patterson because the officer "had an idea" the object was contraband, and then searching the pocket as an incident to that arrest. The record is devoid of reasonable grounds to believe in the factual accuracy of the officer's "idea" or hunch, and it is settled that "An arrest may not be used as a pretext to search for evidence." (*United States* v. *Lefkowitz* (1932) 285 U.S. 452, 467 [76 L.Ed. 877, 884, 52 S.Ct. 420]; *People* v. *Haven* (1963) 59 Cal.2d 713, 719 [31 Cal.Rptr. 47,

---

[1]Nor do the People dispute that Patterson's testimony accusing defendant of selling him the contraband is the fruit of that search and seizure and hence is equally tainted. (Cf. *People* v. *Johnson* (1969) 70 Cal.2d 541 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].)

381 P.2d 927].) ■ Finally, we cannot uphold the search on the novel theory adopted by the magistrate herein, i.e., that by testifying at the preliminary examination on behalf of the People, Patterson impliedly gave "retroactive consent" to the search or "retroactively waived" his objection thereto. His agreement to testify was admittedly the product of his arrest and search and of the district attorney's promise of immunity from the ensuing criminal charges, and it is established that "consent" induced by an illegal arrest or search is not voluntary. (*People* v. *Johnson* (1968) 68 Cal.2d. 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921]; *People* v. *Haven* (1963) 59 Cal.2d 713, 718 [31 Cal.Rptr. 47, 381 P.2d 927].)

■ Conceding therefore that the discovery and seizure of the contraband on Patterson's person were illegal, the People contend instead that only Patterson can complain thereof—i.e., that defendant Kaplan has no "standing" to assert the illegality and prevent the evidence from being used against him at a trial. The People recognize, as they must, that we decided directly to the contrary in *People* v. *Martin* (1955) *supra*, 45 Cal.2d 755, 759-761, in which we adopted for California the rule that a criminal defendant is entitled to object to the introduction of evidence illegally seized from a third person. It is urged, however, that the *Martin* decision is no longer viable. First, we are told, the "vicarious exclusionary rule" is not required as a matter of federal constitutional law under the prevailing interpretation of the Fourth Amendment. (*Alderman* v. *United States* (1969) 394 U.S. 165, 171-176 [22 L.Ed.2d 176, 185-188, 89 S.Ct. 961].) Secondly, although the states remain free to adopt higher standards for searches and seizures than compelled by the federal Constitution (*Cooper* v. *California* (1967) 386 U.S. 58, 62 [17 L.Ed.2d 730, 734, 87 S.Ct. 788]) and specifically to provide that "illegally seized evidence is inadmissible against anyone for any purpose" (*Alderman* v. *United States, supra,* at p. 175 [22 L.Ed.2d at p. 188]), the People contend that the courts of California have been prohibited from doing so since 1967 when section 351 of the Evidence Code went into effect.

The controlling issue, accordingly, is whether section 351 was intended by the Legislature to repeal the *Martin* rule. We shall consider the origin and history first of that rule, then of section 351.

■ In 1955 this court decided the landmark case of *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], adopting for California the rule that evidence obtained in violation of federal or state constitutional guarantees against unreasonable search and seizure is inadmissible in a criminal trial. The twofold purpose of that rule, we explained, was to deter law enforcement officers from engaging in unconstitutional searches and

seizures by removing their incentive to do so,[2] and to relieve the courts from being compelled to participate in such illegal conduct.[3]

Among the numerous decisions which thereafter implemented various aspects of the *Cahan* rule, one of the most important was *People* v. *Martin* (1955) *supra,* 45 Cal.2d 755. In that case the police searched certain offices on two occasions and found the defendant among bookmaking paraphernalia. The defendant's story was that he was a stranger who had merely been hired to watch the premises. He moved to set aside charges of bookmaking on the ground of unlawful search and seizure; relying on the federal rule on the question, the People contended that as the defendant disclaimed any interest in the premises or property he had no "standing" to challenge the legality of the searches and seizures. In a unanimous opinion (at pp. 759-760) we squarely rejected this reasoning: "the rule of the lower federal courts is based on the theory that the evidence is excluded to provide a remedy for a wrong done to the defendant, and that accordingly, if the defendant has not been wronged he is entitled to no remedy. [Citation.] In adopting the exclusionary rule, however, this court recognized that it could not be justified on that theory (*People* v. *Cahan,* 44 Cal.2d 434, 443 [282 P.2d 905, 50 A.L.R.2d 513]), and based its decision on the ground that 'other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activity of law enforcement officers.' (44 Cal.2d at p. 445.)"

The *Martin* opinion went on to explain (at p. 760) the compelling policy reasons underlying our holding. The evil which gave rise to the *Cahan* decision, we said, "occurs whenever the government is allowed to profit by its own wrong by basing a conviction on illegally obtained evidence,

---

[2]"[A] system that permits the prosecution to trust habitually to the use of illegally obtained evidence cannot help but encourage violations of the Constitution at the expense of lawful means of enforcing the law. . . . Granted that the adoption of the exclusionary rule will not prevent all illegal searches and seizures, it will discourage them. Police officers and prosecuting officials are primarily interested in convicting criminals. Given the exclusionary rule and a choice between securing evidence by legal rather than illegal means, officers will be impelled to obey the law themselves since not to do so will jeopardize their objectives." (44 Cal.2d at pp. 449, 448.)

[3]"When . . . the very purpose of an illegal search and seizure is to get evidence to introduce at a trial, the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. It is no answer to say that a distinction should be drawn between the government acting as law enforcer and the gatherer of evidence and the government acting as judge. . . . Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such 'dirty business.' " (44 Cal.2d at p. 445.)

and if law enforcement officers are allowed to evade the exclusionary rule by obtaining evidence in violation of the rights of third parties, its deterrent effect is to that extent nullified. Moreover, such a limitation virtually invites law enforcement officers to violate the rights of third parties and to trade the escape of a criminal whose rights are violated for the conviction of others by the use of the evidence illegally obtained against them."

Our forthright conclusion was that "Since all of the reasons that compelled us to adopt the exclusionary rule are applicable whenever evidence is obtained in violation of constitutional guarantees, such evidence is inadmissible whether or not it was obtained in violation of the particular defendant's constitutional rights." (*Id.* at p. 761.)

The *Martin* rule was thereafter consistently adhered to by this court. (See, e.g., *People* v. *Gale* (1956) 46 Cal.2d 253, 257 [294 P.2d 13]; *People* v. *Kitchens* (1956) 46 Cal.2d 260, 264 [294 P.2d 17]; *People* v. *Perez* (1965) 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934]; *In re Sterling* (1965) 63 Cal.2d 486, 489 [47 Cal.Rptr. 205, 407 P.2d 5]; *People* v. *Butler* (1966) 64 Cal.2d 842, 845 [52 Cal.Rptr. 4, 415 P.2d 819].) Indeed, by 1963 the rule had become so embedded in the law that we held a trial counsel's failure to know and invoke it constituted such a lack of diligence or competence as to reduce the proceedings to "a farce or a sham." (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464-465 [34 Cal.Rptr. 863, 386 P.2d 487].) We there explained, "This rule should be a commonplace to any attorney engaged in criminal trials. It was established in *People* v. *Martin, supra,* within a year of this court's adoption of the exclusionary rule (*People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]) in one of the group of cases decided shortly after the *Cahan* case to articulate the rules governing the exclusion of illegally obtained evidence. It may be readily found in standard reference works. [Citations.]"

It is against this background that we view the enactment of the Evidence Code and particularly of section 351 thereof. The Evidence Code had its genesis in 1956, the year after the *Cahan* and *Martin* decisions, when the Legislature directed the California Law Revision Commission to determine whether the law of evidence in this state should be revised to conform to the Uniform Rules of Evidence approved three years earlier by the National Conference of Commissioners on Uniform State Laws. In 1964 the law revision commission produced its first study, tentatively recommending the revision and then adoption of the Uniform Rules of Evidence. (6 Cal. Law Revision Com. Rep., *passim.*) No action was taken, however, and in 1965 the commission published its second study, recommending instead the enactment of a "new, separate Evidence Code which will include the best features of the Uniform Rules and the existing California law." (7 Cal.

Law Revision Com. Rep., p. 29.) The commission was careful to point out (*id.* at p. 34) that "The proposed Evidence Code is to a large extent a restatement of existing California statutory and decisional law. The code makes some significant changes in the law, but its principal effect will be to substitute a clear, authoritative, systematic, and internally consistent statement of the existing law for a mass of conflicting and inaccurate statutes and the myriad decisions attempting to make sense out of and to fill in the gaps in the existing statutory scheme." It was to be, in short, "a kind of evidence bible for busy trial judges and lawyers." (*Ibid.*)

This being the goal, it is not surprising that the commission proceeded with due circumspection whenever it proposed to change the existing law: "the bulk of the Evidence Code is existing California law that has been drafted and organized so that it is easy to find and to understand. There are some major changes in the law, but *in each case the change has been recommended only after a careful weighing* of the need for the evidence against the policy to be served by its exclusion." (Italics added.) (*Id.* at p. 37.) ■ ■ ■ ■ That process of "careful weighing," moreover, was generally revealed in the official comments appended by the commission to each section of the code.[4] Each comment summarizes the effect of the section, advises whether it restates existing law or changes it, and cites the relevant statutes or judicial decisions in either event. In particular, in every instance in which a significant change in the law would be achieved by the code, the commission's comment spells out that effect in detail and cites the precise authorities which it repeals.[5]

---

[4]These comments are declarative of the intent not only of the draftsmen of the code but also of the legislators who subsequently enacted it. The draft code was introduced at the 1965 session as Assembly Bill No. 333. On April 6, 1965, the Assembly Committee on Judiciary presented a special report containing its new and revised comments to certain of the code sections, but declaring that in all other respects the comments prepared by the California Law Revision Commission "reflect the intent of the Assembly Committee on Judiciary in approving the various provisions of Assembly Bill No. 333." (1 Assem.J. (1965) p. 1712.) In a similar report presented to the Senate on April 21, 1965, the Senate Committee on Judiciary declared that except for its several new and revised comments, the comments prepared by the commission and approved by the Assembly "reflect the intent of the Senate Committee on Judiciary in approving the various provisions of Assembly Bill No. 333." (2 Sen.J. (1965) p. 1573.)

[5]For example, section 405 provides in effect that the trial judge's determination of the voluntariness of a confession is final, and the comment to that section specifies that the contrary rule of *People v. Baldwin* (1954) 42 Cal.2d 858, 866-867 [270 P.2d 1028], is therefore no longer the law. Again, section 600, subdivision (a), declares that "A presumption is not evidence," and the comment recites that the language was added "to repudiate specifically the rule of *Smellie v. Southern Pac. Co.,* 212 Cal. 540, 299 Pac. 529 (1931)." Section 1227 repeals the rule that a statement of a deceased is not admissible against his heirs in a wrongful death action, and the comment explains that the section "changes the rule announced in" *Marks v.*

In sharp contrast, neither the commission's background study nor its comment to any section of the Evidence Code discloses an intent to alter or abolish the *Martin* rule. Indeed, the commission nowhere even mentions, let alone "carefully weighs," that rule. In view of the commission's painstaking analysis of many evidentiary rules that are of far less importance and notoriety than *Martin,* its deafening silence on this point cannot be deemed the product of oversight. It can only mean the commission did not intend—and the code therefore does not accomplish— a change in the *Martin* rule.[6]

This conclusion is reinforced when we analyze the language and setting of section 351, which states in its entirety that "Except as otherwise provided by statute, all relevant evidence is admissible." The section is part of the "General Provisions" article of the chapter on admitting and excluding evidence, itself a part of the "General Provisions" division of the code. It is preceded by a complementary declaration that "No evidence is admissible except relevant evidence" (§ 350), and followed by equally broad provisions recognizing the discretion of the court to exclude evidence when its probative value is outweighed by probable prejudice (§ 352), the effect of the erroneous admission or exclusion of evidence (§§ 353, 354), the use of evidence of limited admissibility (§ 355), and the right to introduce the whole of a writing or conversation when part thereof has been offered (§ 356). None of these companion sections effectuates any change whatever in the law, as the commission carefully notes in each case.[7]

Nor is such a change suggested by the brief official comment to section 351, devoted to an illustrative compilation of statutes which derogate from the general rule of admissibility but are maintained in force by the exception of section 351. It is true that the *Martin* rule is not embodied in a statute as such, but the code does not limit the exception to legislative enactments. Section 230 defines the word "statute" to include "a constitutional provision," and the comment thereto recites that "when a particular section is subject to any exceptions 'otherwise provided by statute,' exceptions pro-

---

*Reissinger* (1917) 35 Cal.App. 44 [169 P. 243]. Finally, section 1235 abrogates the long-settled principle that a prior inconsistent statement of a witness is admissible for impeachment but not for the truth of the matter asserted, and the comment specifies that such cases as *Albert* v. *McKay & Co.* (1917) 174 Cal. 451, 456 [163 P. 666], are therefore no longer the law.

[6]Relevant here is the well-known canon of statutory construction declaring a presumption against repeals by implication. (*Warne* v. *Harkness* (1963) 60 Cal.2d 579, 587-588 [35 Cal.Rptr. 601, 387 P.2d 377].)

[7]Indeed, in its study proposing the Evidence Code the commission stated that the entire division containing section 351 "is, for the most part, a codification of existing law." (7 Cal. Law Revision Com. Rep., p. 35.) The sole exception singled out by the commission was section 405 (see fn. 5, *ante*).

vided by the Constitution also are applicable." A question therefore arises as to whether the *Martin* rule is an exception "provided by" the Constitution.

The People would apparently have us read "provided by" to mean "required by," but the draftsmen of the code used the term in a broader sense. The commission's study explained that "The code will not, however, stifle all court development of the law of evidence. In some instances—the *Privileges* division, for example—the code to a considerable extent precludes further development of the law except by legislation. But, in other instances, the Evidence Code is deliberately framed to permit the courts to work out particular problems or to extend declared principles into new areas of the law." (7 Cal. Law Revision Com. Rep., p. 34.)[8]

Even more importantly, the commission recognized as an obvious truth that "the code neither limits nor defines the extent of the exclusionary evidence rules contained in the California and United States Constitutions. The meaning and scope of the rules of evidence that are *based on constitutional principles* will continue to be developed by the courts." (*Ibid.;* italics added.) Identical language appears in the comment to section 351, which explains that the section "abolishes all limitations on the admissibility of relevant evidence except those that are *based on* a statute, including a constitutional provision." (Italics added.) Tested by this language, the *Martin* rule of standing comes within the exception declared by section 351. As our opinion in *Martin* made plain, that rule was declared solely for the purpose of implementing the *Cahan* decision and for "all of the reasons that compelled us to adopt the exclusionary rule" (45 Cal.2d at p. 761). It is true that, at the time and in the absence of a constitutional mandate from the United States Supreme Court, we deemed it sufficient to treat

---

[8]At this point the commission undertook to summarize its point in a brief formula: "As a general rule, the code permits the courts to work toward greater *admissibility* of evidence but does not permit the courts to develop additional *exclusionary* rules." The People's reliance on the quoted sentence is misplaced, however, for at least two reasons. First, *Martin* is not an "additional" exclusionary rule that in 1965 had yet to be "developed"; it predated the Evidence Code by a decade and, as we have seen, was already a "commonplace" when *Ibarra* was decided in 1963. Secondly, *Martin* is not, strictly speaking, an "exclusionary" rule at all, but a rule of standing. In this context the *exclusionary* rule is the *Cahan* principle that evidence obtained by means of an illegal search and seizure is inadmissible; the rule of *standing* is the *Martin* precept that a defendant is permitted to invoke that exclusion even though the immediate victim of the illegal search and seizure was a third person. While the law of standing may of course affect the admissibility of evidence in certain cases such as the present, it has a far wider scope and reaches well beyond the limited purpose of section 351. It thus appears semantically inaccurate to refer to *Martin* as the "vicarious exclusionary rule," although the label may be retained for reasons of convenience.

*Cahan* as a judicially declared rule of evidence (44 Cal.2d at p. 442). But such a mandate was handed down six years later in *Mapp* v. *Ohio* (1961) 376 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933], and at least since that date the exclusionary rule has been "required in order to give substance to the rights conferred by the provisions of our federal and state Constitutions prohibiting [illegal] seizures. (U.S. Const., 4th Amend., see *Mapp* v. *Ohio,* 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R. 2d 933]; Cal.Const., art. I, § 19, see *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].)" (*People* v. *Reeves* (1964) 61 Cal.2d 268, 275 [38 Cal.Rptr. 1, 391 P.2d 393].) Since the Evidence Code went into effect, moreover, this court has repeatedly reaffirmed *Martin* and its *raison d'être* as a necessary adjunct to *Cahan*: thus in *People* v. *Varnum* (1967) 66 Cal.2d 808, 812 [59 Cal.Rptr. 108, 427 P.2d 772], we emphasized that without *Martin* "the deterrent effect of the exclusionary rule would be seriously weakened"; and the court reiterated this language in *People* v. *Johnson* (1969) *supra,* 70 Cal.2d 541, 553, adding that *Martin* is "the long settled rule in search and seizure cases."

It follows that even though the *Martin* rule may not be "required by" the prevailing federal interpretation of the Fourth Amendment (*Alderman* v. *United States* (1969) *supra,* 394 U.S. 165), it is at least "based on" the constitutionally compelled *Cahan* and *Mapp* principles. By the very terms of the comment to section 351, therefore, it is exempt from the operation of that section. Here, as in *People* v. *Starr* (1970) 11 Cal.App.3d 574, 583 [89 Cal.Rptr. 906], "We do not believe that such a firmly established and fundamental rule of the criminal law of years' standing was overruled by any vague and indecisive provision in the Evidence Code—nor do we believe that the Legislature so intended."[9]

We conclude that defendant has standing under the *Martin* rule to complain of the admittedly illegal search and seizure of Patterson. There being no competent evidence to support the information, defendant is therefore entitled to a writ of prohibition to restrain further proceedings

---

[9]This conclusion makes it unnecessary for us to reach defendant's constitutional arguments that (1) the *Martin* rule is required by the search and seizure clause of article I, section 19, of the California Constitution and (2) if section 351 had purported to repeal the *Martin* rule it would have violated the doctrine of the separation of powers as applied in *Esteybar* v. *Municipal Court* (1971) 5 Cal.3d 119 [95 Cal.Rptr. 524, 485 P.2d 1140], and *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993]. Nothing we say here, however, is meant to foreclose consideration of those issues when it is appropriate to do so.

against him on this charge. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 271 [294 P.2d 23].)

Let a peremptory writ of prohibition issue as prayed.

Peters, J., Tobriner, J., and Sullivan, J., concurred.

**BURKE, J.**—I concur in the result reached by the majority, but only under the compulsion of the "vicarious exclusionary rule" adopted in *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855]. In *Martin,* this court based its decision upon Fourth Amendment principles and relied (pp. 759-760) upon an analysis of prior United States Supreme Court decisions no longer apposite in view of the recent decision in *Alderman* v. *United States,* 394 U.S. 165, 171-176 [22 L.Ed.2d 176, 185-188, 89 S.Ct. 961]. It is clear, therefore, that the majority reaffirm *Martin* solely upon the basis of their own preferences regarding the scope of the exclusionary rule, and have abandoned further reliance upon federal constitutional principles, as defined by the United States Supreme Court. In view of the apparent need for uniform standards in the search and seizure area, I deem such a course improvident.[1]

I would also point out that, contrary to the majority's suggestion, the "pat-down" search of Patterson's outer clothing was entirely reasonable and proper under the circumstances in this case. Unlike the ordinary "furtive gesture" situation wherein the officer observes only some innocent movement of the body (see *Gallik* v. *Superior Court,* 5 Cal.3d 855, 861-862 [97 Cal.Rptr. 693, 489 P.2d 573]; *People* v. *Superior Court,* 3 Cal. 3d 807, 828-831 [91 Cal.Rptr. 729, 478 P.2d 449]), in the instant case Officer Briscoe testified that when he turned on his red light to signal the driver to stop, Patterson looked back, reached under the front seat, looked back once more, and "then he reached in his left or right front pocket, shoved his hand in his coat as the vehicle pulled over to the side of the road." Briscoe testified further that he told Patterson to get out of the car and searched him "Because I felt he was hiding a weapon."

The majority blithely assume that "the 'furtive gesture' observed by Of-

---

[1]It is noteworthy that, as of the date the *Alderman* case was decided (March 10, 1969), California appears to have been the *only* jurisdiction in the United States adhering to the vicarious exclusionary rule. (See separate concurring and dissenting opinion of Mr. Justice Fortas in *Alderman* v. *United States, supra,* 394 U.S. 165, 204 [22 L.Ed.2d 176, 204].) Although as a theoretical matter we may not be bound in this area by decisions of the United States Supreme Court or the courts of our sister states, their unanimity of practice is highly indicative that our decision in *Martin* is neither compelled by constitutional principles nor warranted by the practical considerations underlying the exclusionary rule.

ficer Briscoe did not, without more, give him reasonable grounds to believe Patterson was in possession of a weapon." What more, may I ask, was required to justify a pat-down search? Must the officer wait until a gun is drawn or fired before he may take the standard minimum precautions to protect his own life?

In *People* v. *Superior Court, supra,* 3 Cal.3d 807, 829, we acknowledged "the dangers daily faced by the men who bear the burden of policing our streets and highways, and . . . the fact that even a minor traffic citation incident can occasionally erupt into violence," and we directed our courts to "do all in their constitutional powers to minimize these risks." In my view it is clearly within our "constitutional powers" to hold that an officer who, in the course of stopping a speeding car, observes a passenger reach under his seat and then thrust his hand into his coat pocket, has reasonable grounds to believe that the passenger may have armed himself. (See *People* v. *Collins,* 1 Cal.3d 658 [83 Cal.Rptr. 179, 463 P.2d 403], assuming arguendo the propriety of a pat-down search for weapons when a theft suspect thrust his hand into his pants pocket.) Accordingly, Officer Briscoe properly conducted a pat-down search of Patterson's outer clothing. The further search, however, inside Patterson's pocket was unjustified once the officer determined that Patterson did not possess a weapon. (*People* v. *Collins, supra.*) Thus, I concur in the majority's conclusion that the subsequent seizure of contraband was illegal.

Wright, C. J., and McComb, J., concurred.

The petition of the real party in interest for a rehearing was denied December 29, 1971. Wright, C. J., McComb, J., and Burke, J., were of the opinion that the petition should be granted.