**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Louis J. CELLA, Jr., Stephen R. Evans,
Theodore Schiffman,
Defendants-Appellants.**

**Nos. 76–2722, 76–2740, 76–3041.**

United States Court of Appeals,
Ninth Circuit.

Dec. 9, 1977.

As Amended Jun. 18, 1978.

Rehearing and Rehearing En Banc
Denied Jan. 30, 1978.

Roger S. Hanson (argued), Keith C. Monroe (argued), of Monroe & Riddet, Santa

Ana, Cal., Bruce I. Hochman (argued), of Hochman, Salkin & DeRoy, Beverly Hills, Cal., for defendants-appellants.

David R. Hinden, Asst. U. S. Atty. (argued), Stephen V. Wilson, Asst. U. S. Atty., Chief Fraud and Special Prosecution Division, Los Angeles, Cal., for plaintiff-appellee.

Before BARNES and GOODWIN, Circuit Judges, and JAMESON, District Judge.[*]

BARNES, Senior Circuit Judge:

This appeal stems from the conviction of the three above named defendants on certain criminal counts arising from their participation in a scheme to misappropriate the funds and facilities of two proprietary hospitals in order to use the monies to sponsor the political campaigns of various local and state politicians and also for the personal purposes of two of the defendants. Given vast amount of materials on appeal (5,791 pages in the record and 328 pages of briefs) and the many points raised in the briefs, a lengthy but unavoidable exposition of the facts is required.

I. FACTS.

A. Background.

Mission Community Hospital, Inc. ("Mission Hospital"), which commenced operations in 1971, and Mercy General Hospital, Inc. ("Mercy Hospital"), which opened in 1973, are proprietary hospitals [1] located in Southern California. Both were organized and managed as corporations. The stock of each corporation was owned by a partnership—respectively the Mission Viejo Medical Company ("Mission partnership") and the Bristol General Hospital Company ("Mercy partnership").[2] Corporate and partnership income tax returns were filed during the relevant years herein. Both hospitals had agreements with the United States Department of Health, Education and Welfare whereby they were institutional providers of Medicare services and, hence, were required by law to maintain sufficient and adequate financial records for a determination of costs reimbursement under the Medicare program and to submit annual cost reports.

Defendant Dr. Louis Cella was a partner in both the Mission and Mercy partnerships. He also held the position of secretary-treasurer at the hospitals, and was the de facto controlling force in the management of the corporate entities. George Ollendorf (once a defendant) was the administrator of the Mission Hospital. Initially, defendant Stephen Evans was an assistant administrator under Ollendorf at the Mission Hospital, and in early 1972 was assigned the task of supervising the printing operations. In May of 1973, Evans was transferred to the Mercy Hospital as administrator. Defendant Theodore Schiffman was Cella's "business manager or business consultant", and was involved with Cella in the financial operations of the hospitals.

I. B. Unlawful Activities.

Robert Zunich was the controller at Mission Hospital in October, 1971. He later became executive controller at both hospitals, when Mercy Hospital opened. Starting in Mission Hospital's initial fiscal year of operations, Zunich began to receive instructions by phone from Cella to issue checks to various businesses. Cella would inform Zunich as to who the check was to be made payable, the amount, and how the expense was to be reflected on the books of the hospital. This procedure was a deviation from the normal business practice at

[*] Honorable William J. Jameson, Senior Judge, District of Montana, sitting by designation.

[1.] A "proprietary hospital" is a hospital which is operated for profit, as opposed to a non-profit one.

[2.] In the government's brief on appeal, at pages 11 and 12, it is stated that the corporate entities were operating companies which ran the hospitals while the partnerships actually held the physical assets. Evidence to support this assertion is not clearly delineated in the record.

the hospital.[3] Those checks were usually drafted in favor of business entities which were subsequently discovered to be sham companies whose accounts were controlled by Cella. Zunich repeatedly requested back-up documentation from Cella but was either put off, told it would be forthcoming, or referred to Schiffman.

Ollendorf received similar instructions from Cella to issue "hand checks". Ollendorf later admitted that Cella indicated to him that the checks were to be used for political purposes. Ollendorf told Evans that Cella was instructing him to issue hospital checks for political purposes, and that these checks were being falsely recorded on the books of Mission Hospital as medical expenses. At the end of the first fiscal year, Ollendorf became concerned about his potential liability for signing the Medicare Cost Reimbursement Report which he knew contained a substantial amount of non-hospital related expenses. He discussed the matter with Zunich and later with Evans.

In 1972, Evans was in charge of the print shop at Mission Hospital. During that election year, the print shop, pursuant to Cella's directives, became extremely involved in the printing of political materials. Two commercial printing presses were ordered at a cost of $20,000 each. The amount of paper consumed rose from approximately 15,000 sheets per month to about seven million sheets for the months of April, May and June. Extra employees were hired and placed on the hospital payroll but essentially worked on political printing. Around this period, Evans told Richard Thompson, the supplier of the machines and materials and the trainer of the employees in the print shop, not to discuss the nature of the work being done at the shop with the other employees of the hospital. Several of the regular staff complained about the length of time required to obtain certain hospital forms printed. Thompson was told by Ollendorf, in Evans' presence, that the purchase orders for printing supplies were not to carry the names of the political candidates for whom they were ultimately intended. The print shop later outgrew its quarters at Mission Hospital and was moved to a separate location away from the hospital. By 1974 it was again relocated in the city of Costa Mesa. The print shop was given an individual name, United Printing, but its rent, materials, machines and employees were paid for by the hospitals.

In early 1973, Donald Ray, am employee at the print shop, attended a meeting with Schiffman and Evans wherein the printing of invoices of hospital supply companies was discussed. Later, Ray received certain invoices and was instructed by either Schiffman or Evans to duplicate them in a given number of copies. On one occasion, Evans assisted Ray in the production of a set of invoices. Ray was ordered not to tell anyone about the copying, and to destroy the extra duplicates. These invoices were later shown either to bear the names of certain sham companies controlled by Cella, or to be counterfeit copies of legitimate hospital supply companies. After the invoices were printed, Ray would put them on

---

**3.** Most purchases for the hospitals were initiated by filling out a purchase order, the original of which was forwarded to the supplier and the duplicate copy of which was retained by the hospital. Upon receipt of the ordered supplies, the packing slip, if any, which accompanied the supplies would be matched with the previously issued purchase order. Thereafter, when an invoice for the goods was received, it would be matched with the purchase order and directions given to the hospital's computer to issue a check. Most of the checks were signed and countersigned at the regular Saturday morning meetings at the hospital which Cella regularly attended.

Both hospitals, however, had an alternative system for paying certain bills which, for one reason or another, could not be handled in the foregoing manner, e. g., a C.O.D. delivery. Under the alternative system, a check requisition would be prepared directing issuance of a "hand check" in a stated amount to a stated payee. Cella was the only person who had authority to request "hand checks." The records kept under the alternative procedure consisted of the check requisition, a copy of the check itself, and, when and if received, the invoice from the supplier and the packing slip which accompanied the supplies. Checks issued under this system normally contained only one signature: that of Ollendorf at Mission Hospital and, later, Evans at Mercy Hospital.

Evans' desk for Schiffman to pick up or would deliver them to Schiffman personally.

Beginning in 1973, Zunich began receiving invoices from Schiffman in response to Zunich's request for documentation for unsubstantiated checks. Schiffman did not supply any additional documentation (such as purchase orders or packing slips). These invoices were later shown to be the ones reproduced in the hospital print shop. Eventually, Zunich approached Schiffman and told him that the invoices he was receiving were not related to medical supplies and that the sums were illegally being recorded as expenses of the hospitals. Zunich testified that he also informed Cella and Evans of this unlawful practice. Schiffman, when confronted by Zunich, allegedly responded that he knew what was being done and that the appearance of the invoices was "the best he could do." In addition to submitting false invoices, Schiffman also persuaded one supplier to conceal the purchase of five million litter bags ordered by Cella, with the names of various political candidates printed on them, by using "phony" invoices which hid the fact that the purchase was a political expenditure.

After Mercy Hospital began operations in June of 1973, Gertrude Podruski, the controller, began receiving requests for "hand checks" from Evans who was installed as the administrator of Mercy Hospital. When she requested documentation for the checks, Evans provided her with invoices similar to the ones received by Zunich at Mission Hospital. Podruski eventually noticed that the invoices supplied by Evans were irregular in their type style, and were often from companies which differed from the companies to whom the "hand checks" had been made payable. Podruski was also instructed by Evans to write out checks to him from the petty cash account of the hospital. These checks were used for political contributions. Podruski later told Evans that hospital funds should not be used

in that manner as it was not a reimbursable expense under Medicare, or a deductible expense for tax purposes.

During this period at both hospitals, the hospital payrolls were padded with the addition of "employees" who did political related work rather than medical work on medical jobs. These included, among others, a political survey team which operated out of Evans' office at Mercy Hospital, and the employees of the print shop. Evans, with the knowledge of the extra "employees" and the misuse of hospital funds related above, signed a Medicare Cost Report for Mercy Hospital for the fiscal year ending March 31, 1974, which included such salary payments.

Also during this period, Schiffman was instrumental in setting up bank accounts through which hospital monies improperly obtained could be deposited and later spent. Examples of this activity included a contribution of $10,000 made payable to Jesse Unruh, a candidate for treasurer of the State of California, and a bank account under the name of American Universal Hospital United through which checks in excess of $262,000 were written.

At various times throughout this period, several of the defendants attempted to cover up the activities herein discussed. Cella was confronted by Zunich after Mission Hospital's first fiscal year with a list of some $325,000 of undocumented expenses. Cella admitted that $107,000 of that amount was political expenses, and signed a note in that amount to the partnership. He instructed Zunich to remove the expenses covered by his note from books of the hospital and to add back the remaining amount as proper hospital expenses.[4] Likewise, at the time of the initial investigations of the hospitals, Evans gave Podruski a check for $200,000 with instructions to make reverse entries in the books of Mercy Hospital. Evans also gave Podruski a cashier's check for $3,175 to reimburse the petty cash account at the hospital. Podruski later stated that

4. An additional $80,000 of the remaining amount was shown by the government to also have been political or personal expenses of Cella, and hence should also have been removed from the hospital's books.

both Evans and Schiffman had removed cancelled checks from the files of Mercy Hospital and failed to return them when requested to do so.

## I. C. Investigations of Defendants' Activities:

During 1975, three separate investigations relating to Dr. Cella and certain of his business interests, were initiated. The first of these was an audit of Mission Hospital commissioned by the hospital's Board of Directors in February 1975 and conducted by an accounting firm. The second investigation was carried out by the Orange County District Attorney's Office in June 1975. The third investigation, conducted by the Intelligence Division of the Internal Revenue Service ("IRS") began on July 2, 1975.

In February 1975, the Mission Hospital Board of Directors engaged the accounting firm of Laventhol and Horwath to conduct a "fact-finding" audit of the hospital for the fiscal year ending October 31, 1974 to determine whether certain Mission Hospital expenditures were proper hospital expenditures. Melvin Gagerman, a partner in the accounting firm, was in charge of the audit. His prime contact at Mission Hospital was Zunich who was, of course, thoroughly familiar with the scheme involved. During the course of the audit, there were a number of conversations between Zunich and the auditors regarding insufficient documentation for various items.

The Orange County District Attorney's investigation began in the last week of June when District Attorney Investigator Loren DuChesne was assigned to investigate possible conflicts of interest involving members of the Orange County Board of Supervisors and certain Orange County Assessors. The suspected acts involved a vote on June 3, 1975, by members of the Board of Supervisors to award a contract for health testing for Orange County employees to an entity known as the Orange County Health Testing Institute, which was believed to be controlled by Cella. It was a matter of public record that at least two members of the Board of Supervisors, who had voted for the contract favoring Orange County Health Testing Institute were financially indebted to Cella.

During the course of this investigation, DuChesne interviewed a former employee of both the Mission and Mercy Hospitals regarding the management role and ownership interest of Cella in the two hospitals. During the interview, the employee mentioned that there had existed a section of the Mission Hospital which had housed a printing shop which he described as "off limits" to all persons other than a certain few. He stated that it was common knowledge among hospital employees that the printing operation performed political printing utilizing personnel on the hospital payroll. The chief printer was described as an individual whose first name was Don.

Between July 13 and July 14, 1975, the Orange County District Attorney's Office contacted Ray (who had been arrested on an unrelated matter) and induced him to provide them with information concerning certain activities of the hospital print shop.[5] Ray confirmed the report of the extensive political printing operation at the hospital print shop. On July 21, Ray was again questioned about the printing of political material in the print shop. At a subsequent meeting, Ray, on his own initiative, brought some political brochures and other materials which he had secretly removed from the print shop. He was informed by Inspector DuChesne not to remove anything else from the print shop without being instructed to do so.

The IRS investigation of Cella commenced on July 2, 1975, the preliminary case being assigned to Special Agent Jack Haynes for evaluation. The investigation was initiated by a letter to the IRS from an

---

5. Ray was arrested for soliciting the commission of the murder of his wife. At a meeting on July 17, 1975, with certain members of the Orange County District Attorney's Office, including Investigator DuChesne, Ray's attorney was informed that Ray would receive more lenient treatment if he cooperated with an investigation of the print shop where he worked. Ray agreed to assist the District Attorney's Office.

informant with accompanying newspaper clippings.[6] During the next few weeks (prior to July 28, 1975) Haynes determined that Cella had not filed income tax returns for the years 1972 through 1974. During this period, Haynes requested the returns of the Mission and Mercy partnerships. Haynes also ordered Transcripts of Account and microfilm printouts relating to the tax histories of Cella and his wife.

Up to this point the three investigations had proceeded along separate courses. The first joint meeting of their investigative staffs took place on July 28, 1975, at a meeting at the Airporter Inn between District Attorney Investigators Burton and Miller, Deputy District Attorney Brice, IRS Special Agents Haynes and Daley, John Eppick, a private investigator, and Don Sipple, a legislative aid from Sacramento. The meeting had been arranged by District Attorney Investigator Miller.

On July 28, prior to the Airporter Inn meeting, Ray met with DuChesne and Burton. Ray volunteered that, earlier in the day, he had found a job envelope in his work area containing negatives and paste-ups relating to a special job he had done for Cella. These were certain negatives and paste-ups which Ray had inadvertently come upon. Evans had previously requested that Ray destroy them but Ray had forgotten to do so. Ray stated that the job had consisted of duplicating sets of twenty-five blank invoices, and that he received some of the invoices from Schiffman and some from Evans. Ray told DuChesne and Burton that there were approximately six companies among the negatives and paste-ups. He also stated that the invoices were prepared in blank around income tax filing time, so that someone presumably could doctor them up and use them.

After his interview with Ray, Burton proceeded to the Airporter Inn meeting. During this meeting, Burton asked Special Agents Daley and Haynes whether they would be interested in some phony invoices printed as a special job for Cella. Burton also told Haynes or Daley that an informant was supplying him with documents related to counterfeit invoices that had been printed in numbers of twenty-five. Haynes expressed an interest in these documents.

Between July 28 and August 4, DuChesne and Burton consulted with the Chief of the Writs and Appeals Section of the District Attorney's Office to determine whether certain materials could properly be removed from the print shop for copying. Upon extensively researching the problem, they concluded that Ray could properly remove the negatives and paste-ups and Ray was instructed to do so. Although Ray removed these items from the print shop on August 4, the information contained therein was not made available to the IRS, nor was it discussed with them, until August 8, 1975. The invoices taken by Ray contained the names of ten companies which were used by the defendants in their scheme.[7]

In the interim, the Laventhol and Horwath draft reports were being circulated among various hospital board members, and Dr. T. A. Ross, Chairman of the Board of Mission Hospital, had begun an intensive series of discussions with Zunich. On August 5, 1975, Mission Hospital's Board of Directors requested that Ollendorf resign. On or about the same date, Zunich presented Ross (who had become acting administrator) "with some numbers and said that certain monies had been expended from Mission Community Hospital for non-hospital-related business." Zunich characterized these expenditures as "irregularities." Dr. Ross concluded that if the irregularities were verified, amended Medicare and income tax reports would be required to be filed on behalf of the Hospital.

On August 5, Special Agent Haynes filed a "reopening memorandum" which stated that the reason for reopening the case was

---

6. Cella was identified in one article as having teamed up with the Orange County Democratic Party chairman to contribute more than $500,000.00 to political candidates in 1974.

7. Ultimately, there were fraudulent payments allegedly made to approximately 40 or 50 companies.

"evidence of fraud, malfeasance, collusion, concealment or misrepresentation of material fact." On August 7, the Cella case was "numbered", indicating that it was under active investigation. Special Agents Haynes and Dunlap visited Cella on that date and notified him that he was under investigation by the Intelligence Division of the Internal Revenue Service. After being advised of his constitutional rights, Cella admitted to having failed to file tax returns for 1972 through 1974. On the same date, two teams of special agents were dispatched to interview the accountants who had prepared Cella's personal tax returns, and the returns for the Mission and Mercy partnerships.

On August 8, 1975, Special Agents Haynes and Dunlap met with Investigators DuChesne and Burton for approximately two hours at the office of the Orange County District Attorney. A number of topics were discussed, including political printing and the fraudulent invoices. During the meeting, the IRS agents received copies of the information contained in the negatives and paste-ups removed on August 4 by Ray and copies of the transcripts of the investigators' previous interviews with Ray. The agents were shown copies of the "candidate's report of printing services" which Ray had taken from the print shop on July 24, 1975. Dunlap considered the information obtained from the District Attorney to be indicative of major tax fraud in that Mission Hospital, on instruction from Cella, was deducting political printing costs and related employees' salaries as hospital-related expenses. There was some question as to whether the IRS agents were familiar with that part of the defendants' scheme which involved the use of false invoices prior to the August 8 meeting.

On or about August 14, 1975, Dunlap prepared a work plan which called for an audit of Mission Hospital and Mercy Hospital. Dunlap testified that his decision to audit the hospitals was based upon the possibility that a significant amount of political printing had been deducted by the hospital as hospital expenses. The work plan also made reference to the false invoices,

and speculated that "there may be expense padding between businesses."

On September 4, 1975, Dunlap served a summons on Mission and Mercy Hospitals which covered the hospitals' records for the period 1970 through 1974. The Mission summons was served on Robert Zunich, who was not interviewed at the time. On September 5, Dunlap met with the group of agents who were assigned to assist him in the audit of the hospitals. Dunlap made a list of the ten companies listed on the negatives and paste-ups so auditors could be "on the lookout" for the companies. At about the same time, Dunlap prepared a "to-do list" indicating the areas he wanted to develop during the audit. With reference to the Mission and Mercy audits, Dunlap made a note to look at the printing, paper and employees' expenses.

The Laventhol and Horwath fact-finding audit of Mission Hospital was submitted to the Board on September 9, 1975. The regular Mission Hospital Board of Directors meeting was held on the same date. The Board resolved to engage Laventhol and Horwath to perform in-depth audits of Mission Community Hospital, Inc., Mission Viejo Medical Company and related companies covering "the entire history of the various corporation and partnerships." The Board further resolved:

> "[T]hat if discrepancies are found, that restitution shall be fully made by those responsible. Upon completion of the audit, *all tax returns* and other reports, such as Medicare and Medical reports, shall be *amended* or adjusted appropriately."

At the same meeting, it was resolved that the hospital retain a criminal tax fraud attorney to be "empowered to extend whatever cooperation he deems necessary and fitting and which shall be in the interests of the hospital."

The IRS audit of Mission and Mercy Hospitals commenced on September 12. Dunlap provided the auditors with lists of the ten companies identified on the negatives and paste-ups. The initial state of the au-

dit consisted of a review of memorandum copies of checks that had been issued in payment of various services. A list of "questionable items" was compiled and the corresponding original checks were "pulled" from the files. All items pertaining to printing and paper expenses and other items appearing questionable were also "pulled". The agents then checked the invoices which corresponded to the various checks.

During the course of the audit, Dunlap discovered red marks on the memorandum copies of certain checks. To Dunlap these marks "were indicative of an audit trail or prior examination by other auditors". He noted that these marks corresponded in a large percentage to the same type of items he was interested in. As the audit progressed, he began pulling every check that had a red mark on it. Dunlap also noted that, whereas most of the hospital checks were prepared by computer, there was a high correlation between questionable items and handmade or typed checks. A similar correlation was discovered with respect to checks signed only by Ollendorf. The list of "questionable items" compiled at Mission and Mercy Hospitals ultimately involved approximately sixty separate companies, including *some* of the ten companies identified in the negatives and paste-ups.

On September 16 and 19, 1975, Ray brought additional materials out of the print shop which related to the printing of political materials. Ray obtained for the investigators a spiral notebook labeled "Dr. Cella" which listed printing jobs for Cella beginning July, 1972. No cost information was reflected in the notebook. On September 19, 1975, Ray removed a series of print shop production records. The documents described therein apparently represent both hospital-related, and political, materials. None of these documents contained any cost-related information.

Between September and October 1975, Zunich prepared two lists setting forth irregular expenditures at Mission between November 1972 and October 1974. These lists were prepared in accordance with the direction of Mission's Board of Directors. The irregular transactions were listed on these schedules by check number, payee and amount. Transactions involving six of the ten companies identified on the negatives and paste-ups were described on these schedules.

On October 21, 1975, the Orange County District Attorney's Office was contacted by an attorney who stated that he had a client who was a ranking member of the administrative staff of Mission Hospital. The attorney further advised that his client possessed extensive information and documentation concerning the commission of a crime involving thefts of funds from Mission and Mercy Hospitals and wished to disclose the same to the District Attorney.

Following discussions between the attorney and the District Attorney's Office, the identity of the witness was disclosed and it was agreed that he would receive immunity if he agreed to testify for the prosecution. The witness was Robert Zunich. Up to this point in time, Zunich had not provided any information to the IRS, or the District Attorney's Office, nor was he aware of Ray's cooperation with the District Attorney's Office.

Zunich provided detailed and comprehensive information pertaining to certain fraudulent accounting practices executed upon the books of the Mission Hospital, Mercy Hospital, and other related entities. Zunich told investigators that the hospitals made numerous checks payable to nonexistent companies, and to legitimate companies pursuant to fraudulent invoices.

During the aforesaid interviews, Zunich displayed to the local authorities numerous documents, including a series of invoices representing transactions for which the necessary documentation was lacking and which transactions he had determined to be fraudulent. These documents had been compiled by Zunich over the years from both Mission and Mercy Hospitals. These documents included the schedule of irregular payments prepared by Zunich during September and October.

During the first week of November, Zunich rearranged the Mission Hospital records by segregating all records relating to "irregular transactions for the previous four years." Zunich did this "to help our internal and external auditors perform the audit function."

On November 12, 1975 when Special Agent Dunlap arrived at the hospital, Zunich presented him with the documents pertaining to the irregular transactions. Sometime shortly thereafter, Zunich provided Dunlap with copies of the schedules of irregularities that he previously had prepared for the Board of Directors. Approximately one week after the November 12 meeting, Zunich was granted immunity by federal prosecutors.

On November 21, 1975, Dunlap saw inside of Schiffman's automobile various boxes of documents and ledgers. Assuming them to be relevant to the investigation, he attempted to contact the United States Attorney on the case in order to get a search warrant. Failing to reach him, Dunlap informed DuChesne of the facts. DuChesne obtained a warrant, and the items were seized. Although he did receive the seized materials, Dunlap did not examine the materials as he was told not to by the United States Attorney. Around this same period of time, various other state warrants were executed and some of the seized material was turned over to the federal tax investigators.

*I. D. Indictment and Disposition by the District Court.*

On January 12, 1976, defendants Cella, Schiffman, Ollendorf and Evans were named in a forty-five count indictment charging conspiracy (18 U.S.C. § 371), theft of government property (18 U.S.C. § 641), false statements to the government (18 U.S.C. § 1001), mail fraud (18 U.S.C. § 1341), tax evasion (26 U.S.C. § 7201), false income tax returns (26 U.S.C. § 7206(1)), aiding and abetting the preparation of a false income tax return (26 U.S.C. § 7206(2)) and aiding and abetting (18 U.S.C. § 2).

Prior to trial, the defendants submitted various motions to suppress. An evidentiary hearing was held on April 20, 1976 and at various times between May 4 and May 18, 1976. Specifically, the defendants moved to suppress the documents obtained by the Orange County District Attorney's Office from Donald Ray, and other items seized pursuant to various state warrants executed upon Schiffman's car and office, and at the aforesaid print shop.

The trial court held that the defendants Ollendorf, Schiffman, and Evans had no standing to suppress the items turned over by Ray. The court found that Cella did have standing and suppressed all the items turned over by Ray to the Orange County District Attorney's Office on or after August 4, 1975. These items consisted primarily of six paste-ups and ten negatives he had used two years earlier to print invoices at the hospital at the direction of Schiffman and Evans. Ray had provided a certain amount of material from the print shop prior to August 4, 1975. The court also ruled that a state search warrant for the print shop dated November 12, 1975, was improperly obtained and suppressed all evidence taken pursuant to that warrant. The court did not suppress the November 21, 1975 search of Schiffman's car and office. Because the other defendants were jointly tried with Cella, the documents suppressed for Cella were also suppressed as to the other defendants.

At trial, the government did not introduce any evidence turned over by Ray nor did it introduce any evidence taken from Schiffman's car or office. Nevertheless, Cella argued that the government's evidence (which at trial included in excess of fourteen hundred exhibits) was tainted because of pivotal information obtained from the paste-ups and negatives turned over by Ray to the District Attorney's Office on August 4, 1975. This information became known to the IRS on August 8, 1975. The court rejected the "fruit of the poisonous tree" argument and specifically found that the evidence against Cella was derived from "significant independent sources."

After the ruling on the suppression hearing, the defendant Ollendorf plead guilty to two counts of the indictment charging him with aiding and abetting the submission of false Medicare Cost Reimbursement Reports of Mission Hospital for its 1972 and 1973 fiscal years. The remaining defendants waived jury trial and findings of fact and the trial commenced on June 1, 1976. The government, upon the suggestion of the court, dismissed twenty-one counts of the forty-four count indictment prior to trial.

On June 24, 1976, the court found defendant Cella guilty on twenty-two counts which included conspiracy (18 U.S.C. § 371), false statement to the government (18 U.S.C. § 1001), tax evasion (26 U.S.C. § 7201), false income tax returns (26 U.S.C. § 7206(1)), aiding and abetting the preparation of a false income tax return (26 U.S.C. § 7206(2)), and aiding and abetting (18 U.S.C. § 2). He was sentenced to five years on the conspiracy count with the additional sentences on the other counts to run concurrently. Defendant Schiffman was found guilty on ten counts and was sentenced to ten concurrent sentences of two and one half years each. Defendant Evans was convicted on six counts and received six concurrent one year sentences.

## II. ISSUES ON APPEAL

On appeal, defendant Cella does not challenge the *sufficiency* of the evidence against him, but only challenges the court's finding that the evidence against him was not tainted. He also objects to the court's ruling, after it found an illegal search and seizure, which placed the burden of proof on the defendant to establish the extent of the taint. The government, in turn, challenges the court's holding that Cella had standing to object to the removal of the negatives and paste-ups and the other seizures at the print shop.

Defendants Schiffman and Evans both argue that they have standing to object to the searches, and thus to raise the issue of tainted evidence, because they would have standing under state law. Defendant

Schiffman likewise asserts that there was insufficient evidence to convict him. In this regard, he also claims a violation of the confrontation clause through the operation of the co-conspirator exception to the hearsay rule. He further argues that the search of his automobile was improper. Finally, he urges a reversal of his conviction on a theory based on alleged governmental misconduct in the investigation of this case.

Defendant Evans raises a question as to the general sufficiency of the evidence against him. Specifically, he argues that there was no evidence that he caused an expense entry onto the books of the hospitals which he knew at the time was not really an expense item. He further argues that he cannot be convicted of violating 18 U.S.C. § 1001 (false statement to the government) as it was not shown that, by causing a false entry to be made in the books of a private corporation, the defendant would necessarily know that such false entry would later be reported to a government agency. Evans also asserts that his multiple convictions rested upon the same acts, and hence were multiplicious. Lastly, he challenges the court's refusal to grant his motion for severance from the trial with Cella.

## III. DISCUSSION

### III. A. Standing.

1. Applicable law to determine standing.

■ Initially, in response to the argument asserted by the defendants Evans and Schiffman, it must be determined whether the issue of standing to object in federal court to evidence obtained pursuant to a search performed by state agents is a question to be resolved under state or federal law. The defendants contend that under California law it "is clear that evidence which is seized illegally under California law is inadmissible regardless of whether a particular seizure invades the individual rights of persons against whom it is offered. *Kaplan v. Superior Court*, 6 Cal.3d 150, 98 Cal.Rptr. 649, 491 P.2d 1 (1971);

*People v. Martin*, 45 Cal.2d 755, 290 P.2d 855 (1955)."[8]

We need not consider the validity of the defendants' interpretation of California law as we hold that the issue of standing in this case is to be determined under federal law.[9]

Standing to object to evidence supposedly improperly seized is predicated on the objector alleging, and—if challenged—proving, he was the victim of an invasion of privacy. *United States v. Canada*, 527 F.2d 1374, 1378 (9th Cir. 1975), *cert. denied*, 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976); *United States v. Haddad*, 558 F.2d 968, 975 (9 Cir. 1977); *Accord, Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

"In determining whether there has been an unreasonable search and seizure by state officers [and likewise to determine whether the objector has been the victim of an invasion of privacy], a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court and irrespective of how such an inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States*, 364 U.S. 206, 223–224, 80 S.Ct. 1437, at 1447, 4 L.Ed.2d 1669 (1960).

The independent inquiry begins with the preliminary question of whether or not the objecting party is, under Rule 41(e) of the Federal Rules of Criminal Procedure ("FRCrimP"), a "person aggrieved" so as to have the necessary standing to present his motions to suppress. *Boyle v. United States*, 395 F.2d 413, 415–416 (9th Cir. 1968), *cert. denied*, 393 U.S. 1089, 89 S.Ct. 861, 21 L.Ed.2d 782 (1969). Therefore, despite the potentially more liberal California rule on the issue of standing, it is held here that the matter is governed in the federal courts by Rule 41 of the FRCrimP, and hence by federal law, even though the evidence objected to was seized by state agents and subsequently handed over to federal officers.

The defendants cite three cases decided by this court to support their argument, *i. e., United States v. Solomon*, 528 F.2d 88 (9th Cir. 1975); *United States v. Lovenguth*, 514 F.2d 96 (9th Cir. 1975); and *United States v. Walling*, 486 F.2d 229 (9th Cir. 1973), *cert. denied*, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974). However, those cases do not consider the issue of standing, but rather establish the proposition that the propriety of a stop by a state officer is subject to review under the stan-

---

**8.** However, as recognized by the California Supreme Court in *Kaplan, supra*, 6 Cal.3d at 161, 98 Cal.Rptr. 649, 491 P.2d 1, the "vicarious exclusionary rule" which it established in the *Martin* case differs from, and may not be required by, the prevailing federal interpretation of the Fourth Amendment." It is noted here that a state court may not impose greater restrictions, as a matter of federal constitutional law, on police activity with respect to search and seizures than the United States Supreme Court holds to be necessary. *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *United States v. Bedford*, 519 F.2d 650, 654 n. 3 (3rd Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 3049, 47 L.Ed. 323 (1976). The United States Supreme Court has further observed that "The standing requirement is premised on the view that the 'additional benefits of extending the . . . rule' to defendants other than the victim of the search or seizure are outweighed by the 'further encroachment upon the public interest in prosecuting those accused of crime and having them

acquitted or convicted on the basis of all the evidence which exposes the truth.' *Alderman v. United States*, .. . [394 U.S. 165] at 174–175, 89 S.Ct. 961, 22 L.Ed.2d 176." *Stone v. Powell*, 428 U.S. 465, 488–489, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

**9.** *See United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), and this Circuit's en banc majority opinion in *United States v. Hall*, 543 F.2d 1229 at 1231 to 1234 (1976), *cert. denied* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977) and *United States v. Keen*, 508 F.2d 986 (9th Cir. 1974), *cert. denied* 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975).

Of course, a state is free, if it so desires, to establish pursuant to its own laws and constitutional rules of standing for application in its own courts which are more liberal then those employed by the federal courts. *Cf. Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

dards of both state and federal law. While it could perhaps be argued that the failure to apply the more liberal state rule as to standing would encourage state officials to carry out searches which would be contrary to the law of their own jurisdiction, that possibility is too remote to warrant a change in the rule as to the applicable law. *Cf. United States v. Calandra*, 414 U.S. 338, 351, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Moreover, given that the ultimate determination by a federal court of the reasonableness of the search by state officers is to be decided under federal law, *Preston v. United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *Elkins, supra*, 364 U.S. at 224, 80 S.Ct. 1437, it would appear to be senseless to apply a more liberal rule of standing to permit the defendant to raise the challenge when it is clearly evident that the defendants' objection must fail. The federal law does not recognize these defendants to be persons entitled to make the objection. Their rights under the federal constitution are not deemed to have been adversely affected. Finally, at least one circuit court has held that evidence seized in actual or possible violation of state law may nonetheless be admitted in a federal prosecution where the violation committed would not be one which would require suppression of the evidence under the federal constitution or the federal statutory or case law. *United States v. Dudek*, 530 F.2d 684, 690 (6th Cir. 1976).

*III. A. 2.* Factors sufficient to establish standing.

This Court has noted that standing to move to suppress can either be implied as a matter of law (automatic standing) or established by the facts of the case (actual standing). *United States v. Guerrera*, 554 F.2d 987, 989 (9th Cir. 1977); *United States v. Boston*, 510 F.2d 35, 37 (9th Cir. 1974), *cert. denied*, 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975).

■ In *Jones, supra*, 362 U.S. at 263–265, 80 S.Ct. 725, the Supreme Court established the rule of automatic standing under which standing is conferred to a defendant "by a charge of a crime which includes as an essential element possession of the evidence seized, with such possession or rights to possession existing at the time of the seizure." *Boston, supra*, 510 F.2d at 37. Given that the criminal charges in this case do not include a possession element, automatic standing is not present herein. *Guerrera, supra*, 554 F.2d at 989–990; *United States v. Prueitt*, 540 F.2d 995, 1004–1005 (9th Cir. 1976), *cert. denied*, 429 U.S. 838, 97 S.Ct. 107, 50 L.Ed.2d 104 (1977).

■ To establish actual standing, the defendant must demonstrate that he was the victim of an invasion of privacy. *Jones, supra*, 362 U.S. at 261, 80 S.Ct. 725. What is meant by "invasion of privacy" in this context has been made clear by the Supreme Court: the moving party must either (1) have owned or possessed the seized property at the time of the seizure, (2) have had a substantial proprietary or possessory interest in the premises searched, or (3) have been legitimately on the premises when the search occurred. *See, Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Simmons v. United States*, 390 U.S. 377, 392, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

■ Defendant Cella argues that, in addition to the above criteria for establishing standing, there exists a so-called "target" doctrine under which one against whom the search was directed has per se standing to object to evidence seized in the search. Cella cites to the following language in two Supreme Court decisions:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, *one against whom the search was directed*, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." [Emphasis added.] *Jones, supra*, 362 U.S. at 261, 80 S.Ct. at 731.

". . . [M]y position . . . requires that we include within the category of those who may object to the introduction of illegal evidence 'one against

whom the search was directed.' Such a person is surely 'the victim of an invasion of privacy' and a 'person aggrieved,' even though it is not his property that was searched or seized." [Footnote omitted.] Concurring opinion of Justice Fortas, *Alderman v. United States*, 394 U.S. 165, 208–209, 89 S.Ct. 961, 985, 22 L.Ed.2d 176 (1969).

The above quote from the *Jones* case is clearly taken out of context. The Supreme Court in that case states that:

"Ordinarily, . . . it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy." *Jones, supra*, 362 U.S. at 261, 80 S.Ct. at 731.

The Court then goes on to establish the rule as to automatic standing (for cases wherein the defendant is charged with an offense which includes, as an essential element, possession of the seized evidence) and also to find that the defendant had the legally requisite interest in the premises searched to give him standing. Again, in *Alderman, supra*, 394 U.S. at 176–180, 89 S.Ct. 961, the Court held that a petitioner would be entitled to the suppression of evidence violative of the Fourth Amendment where the Government unlawfully overheard conversations of the petitioner himself, or where the conversations occurred on his premises, whether or not he was present or participated in them. The Court did not adopt Justice Fortas' view that merely being a "target" of a search is sufficient to confer standing.

Of the cases cited to support the target doctrine, all except one merely have dicta concerning the quoted passage from *Jones* and, in reality, base their findings of standing along the lines expressed in *Brown*.[10] The only case we find which squarely supports defendant Cella's position is *United States v. Rosenberg*, 416 F.2d 680, 681–682 (7th Cir. 1969). No decision by this Court has been found which supports a per se rule of standing to a defendant merely because he is the target, rather than the victim, of a search and seizure.

■ The target doctrine as proffered by defendant Cella is inconsistent with a primary tenet of constitutional law that the rights protected by the Fourth Amendment are personal rights, and may be enforced by exclusion of evidence secured by means of an unlawful search and seizure only by one whose own protection and privacy was infringed by the search and seizure. *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself . . .." *Alderman, supra*, 394 U.S. at 171–172, 89 S.Ct. at 965. The doctrine is also inconsistent with the Supreme Court's delineation of the elements which demonstrate actual standing. "To establish standing to move for suppression of evidence assertedly illegally seized, the claimant must show the kind of interest in that evidence set forth in *Brown v. United States*, 411 U.S. 223, 229–230, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) . . .." *United States v. Kahan*, 415 U.S. 239, 242, 94 S.Ct. 1179, 1180, 39 L.Ed.2d 297 (1974). As stated

---

10. *I. e.*, in *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the moving party had a possessory, although not proprietary, interest in the house searched as he lived in the house with the owner, his grandmother. In *United States v. Mulligan*, 488 F.2d 732 (9th Cir. 1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974), the defendant was the "true proprietor" of the vehicle searched, even if he did register it under a different name. In *United States v. Mapp*, 476 F.2d 67 (2d Cir. 1973), the Second Circuit specifically found the target doctrine to be an "open question" and decided the case under the automatic standing rule. In *United States v. Cobb*, 432 F.2d 716 (4th Cir. 1970), while finding the defendant to be one against whom the search was directed, the court also applied the automatic standing rule. In *United States v. Kelly*, 529 F.2d 1365 (8th Cir. 1976), the defendant both had a propriety interest in the objects seized and also was charged with offenses which included possession as an essential element.

in *Brown, supra*, 411 U.S. at 229, 93 S.Ct. at 1569, which we here emphasize:

> "In deciding this case, therefore, it is sufficient to hold that there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure."

Finally, the adoption of a target doctrine would lead to confusing and useless results as the fact that one is the target or object of a search does not mean that one's privacy will be invaded. For example, while investigating a suspect, government agents may decide to search his bank records. Although the suspect is clearly the target of the search, he would not have standing to suppress such evidence, as a bank depositor does not have a protectable Fourth Amendment interest in the bank's records of his account. *Cf., United States v. Miller*, 425 U.S. 435, 442–443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The confusion arises from interpreting the phrase "one against whom the search was directed" to mean one whom the agents intend to use the evidence against rather than one who actually suffers the intrusion of the search and seizure by being the actual victim of the invasion of privacy.

### III. A. 3. Standing of the defendants.

Although government agents made several searches and seizures in the course of their investigation of this case, only three of those searches, which were objected to by the defendants at the trial level, are challenged on appeal. All three appellants challenge Ray's removal of the negatives and paste-ups of the false invoices which were composed at the print shop of the

Mission Hospital during the spring of 1973. They also challenge Ray's removal of various documents from the print shop in 1975. Defendant Schiffman also objects to the search of his automobile.

■ It is clear that after meeting with the state district attorneys on or about July 17, 1975, Ray agreed to become an informant and obtain information for the government. Ray was thereafter a government agent and his actions must be viewed accordingly. *See Hoffa v. United States*, 385 U.S. 293, 295–299, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

The trial judge, without delineating his reasons, found that Cella had standing as to the print shop and its contents while the other defendants had none.

### III. A. 3(a). The print shop.

■ At the time of the removal of the documents by Ray, the print shop had been moved from its initial office at the Mission Hospital to separate quarters in Costa Mesa. As to defendants Evans and Schiffman, it is clear that they had neither a possessory nor a proprietary interest in the print shop at that time. They neither owned an interest in the operations, nor actually worked there.[11] Likewise, it was not shown at trial that either were on the premises during Ray's seizings of the documents nor was it shown that either of them had a possessory or proprietary interest in the materials removed. Thus, the trial judge correctly held that both Evans and Schiffman did not have standing.

Defendant Cella argues that he had a sufficient interest in the print shop to establish standing. First, he cites the fact that he had control over the operations of the print shop which was then doing business under the name United Printing Company.[12] However, that control was part of

11. While Evans had been in charge of running the print shop at Mission Hospital, after May of 1973 he was made administrator of Mercy Hospital and his job was taken over by another employee, Paul Ideker. Unlike *Mancusi v. De Forte*, 392 U.S. 364, 368–369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), Evans and Schiffman were not shown to have spent "a considerable amount of time" in the office, or have custody of the papers, at the moment of their seizure.

12. In 1974, Paul Ideker was requested by Cella to file a statement of doing business in the name of United Printing Company. Ideker

his duties as de facto manager of the hospital operations. Indeed, the equipment was purchased, employees hired, and rent and supplies were paid for by the hospitals.[13] While United Printing did do some work for entities other than the hospitals and had its own phone listing, the great majority of its printing was for the hospitals. Second, Cella cites to the fact that he had a key to the print shop and visited the operations about once a month. Third, Cella points out that several of the employees and persons who did business with the print shop thought of it as Dr. Cella's business.[14]

 We disagree with the trial judge's conclusion that Cella had standing as to the print shop. Cella was only a corporate officer and consequently, while he had access to and control of the print shop operations, his rights did not include any expectation of privacy over documents which were kept at the print shop premises but over which Cella did not show an independent possessory or proprietary interest. *United States v. Britt*, 508 F.2d 1052, 1055 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975). Unlike the appellant in *Mancusi v. De Forte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), Cella did not show that he spent a "considerable amount of time" at the print shop. Likewise, there is insufficient evidence in the record to demonstrate that United Printing Company was owned and operated by Cella as a separate entity entirely apart from the hospitals.

*III. A. 3(b).* The negatives and paste-ups.

In 1973, the paste-ups were given to Ray by either Schiffman or Evans for Ray to duplicate by making negatives of the invoices and then printing them. Ray was instructed to destroy the excess copies, the negatives, and the paste-ups, *after* he completed the job. He did destroy the extra copies but forgot to destroy the negatives and paste-ups. Two years later, after he had agreed to become an informant, Ray by chance came across a job envelope with the words "Dr. Cella" on the cover in his general work area. Inside the envelope were the negatives and paste-ups.

 The government argues that the defendants abandoned the negatives and paste-ups when they ordered Ray to destroy them. If a person has voluntarily abandoned property, he has no standing to complain of its search and seizure. *Abel v. United States*, 362 U.S. 217, 240–41, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *United States v. Knight*, 412 F.2d 292 (9th Cir. 1969). Abandonment in this context is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retains a reasonable expectation of privacy in it at the time of the search. *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976). The issue therefore is a factual one; abandonment is primarily a question of intent, and intent may be inferred from words, acts and other objective facts. *Id.* The requisite intent has been held to be present by such acts as: throwing contraband out of a moving vehicle when pursued by police, *United States v. McLaughlin*, 525 F.2d 517, 519 (9th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976); a denial of ownership when questioned, even if the defendant is seen previously in possession of the item, *Jackson, supra*, 544 F.2d at 409 and 411; and leaving the item behind in a trash basket at a hotel after checking out, *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d

complied with the request and listed himself as sole proprietor of the entity. Ideker testified that he considered Cella to be his immediate supervisor and policymaker with regard to the print shop operations. However, Ideker considered himself an employee of Mission Community Hospital.

**13.** United Printing Company did pay for the gas and electric bills, some small moving expenses, one small payment for a part-time employee and other minor costs.

**14.** There is testimony in the record that, when asked by Dr. Ross (Mission Hospital's Chairman of the Board) who owned United Printing, Cella replied that he did not know but thought that Paul Ideker ran it.

668 (1960), or in a trash can next to the sidewalk, *United States v. Mustone*, 469 F.2d 970, 972 (1st Cir. 1972). (Again, *see* Note 14.) As we have previously discussed, the defendants did not have a possessory or proprietary interest in the premises on which Ray found negatives and paste-ups. The defendants' claim of a reasonable expectation of privacy must therefore be based on their interest in the materials seized. But by telling Ray to destroy the negatives and paste-ups, and failing to ensure that he did so, the defendants abandoned the materials and lost any reasonable expectation of privacy in them.

 Defendant Cella argues that he, himself, never gave Ray orders to destroy the negatives and paste-ups and thus still has standing. He seeks to bolster this argument with the fact that when Ray found the materials in 1975 they were contained in an envelope with Cella's name on it. However, it is initially noted here that Evans and Schiffman were clearly Cella's agents when they instructed Ray to destroy the items. Cella never contacted Ray directly concerning any aspect of the printing of false invoices. Secondly, the mere fact that the negatives and paste-ups were found in an envelope with Cella's name on it is insufficient to demonstrate that Cella still retained any expectation of interest in them. The envelope was found in the work area of the print shop which was most often used by Ray and never shown to be utilized by any of the defendants. Moreover, there is no evidence in the record that any of the defendants did salvage the printing materials, or place them in an envelope for safekeeping. Such actions would be entirely inconsistent with their prior order to destroy the negatives and paste-ups. In conclusion, we find that all defendants abandoned the materials and thus lost their standing to object to a subsequent search and seizure of them.

Ray then returned them to the print shop. Clearly, Ray had sufficient control over the negatives and paste-ups to consent to their examination and duplication by government officers. *United States v.*

*Murphy*, 506 F.2d 529, 530 (9th Cir. 1974), *cert. denied*, 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975); *cf. United States v. Matlock*, 415 U.S. 164, 170–171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

### III. A. 3(c). Schiffman's car.

 Obviously, Schiffman has standing to object to the search of his own automobile. However, the trial judge found sufficient probable cause for the warrant and, after examining the record, we agree. Defendant Schiffman's argument that the government agents used tainted evidence to secure the search warrant is not supported by the facts of this case.

### III. B. Taint.

Assuming *arguendo* that the trial court was correct in its holdings that defendant Cella had sufficient standing to object to the searches and seizures of the negatives and paste-ups and the print shop, and that the materials were improperly obtained, we agree with the court's subsequent conclusions as to the burden of establishing the extent of the taint, and the fact that the evidence submitted at the trial came from independent sources which were free of any taint.

### III. B. 1. Burden of establishing the extent of the taint.

 As held by the Supreme Court and adopted by this circuit, the trial court must determine whether the prosecution used unconstitutionally seized material directly or indirectly to develop the evidence it produced at trial, or whether it obtained its trial evidence from an independent and untainted source. *Alderman, supra*, 394 U.S. at 183, 89 S.Ct. 961; *United States v. Polizzi*, 500 F.2d 856, 910 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975). Initially, the defendant who shows that he was the victim of an unconstitutional search must go forward with specific evidence demonstrating taint. *Alderman, supra*, 394 U.S. at 183, 95 S.Ct. 802; *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

The burden then shifts to the government to show that it acquired its evidence from an independent source. *Polizzi, supra,* 500 F.2d at 910.

▌ Defendant Cella contends once an illegal search and seizure has been established, the burden is upon the government to demonstrate that each piece of evidence, and each witness is free of taint. As correctly pointed out in the government's brief herein, that rule is applicable only to Fifth Amendment situations and not to Fourth Amendment violations. The Second Circuit has recently given a perceptive discussion of this distinction:

> "Determining whether evidence is tainted as the fruit of an unconstitutional search or seizure, or whether the taint is attenuated, presents many of the same problems as deciding whether the evidence used against Kurzer is derived from his prior immunized testimony. However, the two situations are distinguishable, as commentators have emphasized. The reason is that the principal function of the Fourth Amendment exclusionary rule is to deter unlawful police conduct, and it can be argued that it serves little deterrent purpose to exclude evidence which is only indirectly and by an attenuated chain of causation the product of improper police conduct. The Fifth Amendment, in contrast, is by its terms an exclusionary rule, and as implemented in the immunity statute it is a very broad one, prohibiting the use not only of evidence, but of 'information,' directly or indirectly derived from the immunized testimony. The statute requires not merely that evidence be excluded when such exclusion would deter wrongful police or prosecution conduct, but that the witness be left 'in substantially the same position as if [he] had claimed the Fifth Amendment privilege.'" [Citations omitted.]

*United States v. Kurzer,* 534 F.2d 511, 516 (2d Cir. 1976).

*III. B. 2.* What constitutes taint.

▌ While both direct and indirect use of illegally seized information will taint any subsequently produced evidence, the defendants here also argue that, if such information causes the government to intensify its investigation or if it gives an impetus or direction toward what is to be focused on by the government, then all evidence thereafter produced must be suppressed. The defendants'· position is not consistent with the law of this circuit.

The Supreme Court in *Wong Sun v. United States,* 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), stated that:

> " . . . We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, *Evidence of Guilt,* 221 (1959)."

This court, in considering the question of whether an intensification of an investigation was induced by the information from an illegal seizure, held that:

> " . . . defendants argue that they produced sufficient evidence to trigger a hearing into whether 'illegally secured information [led] the government to substantially intensify an investigation [making] all evidence subsequently uncovered [a product] " . . . of that illegality." ' *United States v. Schipani,* E.D.N.Y., 1968, 289 F.Supp. 43, 62, *affirmed,* 1969, 414 F.2d 1262, *cert. denied,* 1970, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102. That is not the law in this circuit or any other. *United States v. Brandon,* 9 Cir., 1972, 467 F.2d 1008, 1010; *United States v. Bacall,* 9 Cir., 1971, 443 F.2d 1050, 1056–57, *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557. '[T]o grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not

the law-abiding citizen he purported to be would stretch the exclusionary rule beyond tolerable bounds.' *United States v. Friedland, supra*, 2 Cir., 441 F.2d 855 at 861 (Friendly, J.)" [Footnote omitted.] *United States v. Sand*, 541 F.2d 1370, 1376 (9th Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977). Likewise, in considering the direction and impetus question, the court noted:

"Evidence need not be suppressed merely because it would not have come to light but for the illegal wiretap. The district court must seek to discover what kind of direction and impetus the illegal wiretap gave to the Cales investigation: did anything seized illegally, or any leads gained from that illegal activity, tend significantly to direct the investigation toward the specific evidence sought to be suppressed? Under this test the government should have the opportunity to establish that, even though the information in the wiretap may have been a factor in the decision to 'target' Cales, the evidence which it intends to use at trial was obtained from sources sufficiently independent of the wiretap."

*United States v. Cales*, 493 F.2d 1215, 1215–1216 (9th Cir. 1974).

*III. B. 3.* Independent source of the evidence offered at trial.

 The defendants contend that the discovery of the names of ten companies which were contained in the negatives and paste-ups of the phony invoices removed by Ray totally infected the government's ability to obtain the evidence it offered at trial. The trial judge, however, found that there were independent sources of the evidence. We agree.

Specifically, the defendants contend that: (a) prior to the removal of the negatives and paste-ups, the government did not have any basis or impetus or direction in its investigation, (b) that without the use of the list of ten companies the audits of the hospitals would not have resulted in viable evidence against the defendants; and (c) that Zunich would not have become a government's witness had it not been for the discovery of the list which caused an intensification of the investigation which, in turn, prompted Zunich to cooperate with the prosecution.

(a) The government's investigation of Cella was not as aimless as portrayed by the defendants here. At the July 28, 1975 meeting at the Airporter Inn, the federal agents were informed of the political printing and of the existence of phony invoices. That information was relayed by Ray and was prior to the allegedly illegal removal of the negatives and past-ups. While that removal occurred on August 4, 1975, the information contained therein was not made available to the IRS, nor was it discussed with them, until August 8. On August 5, a reopening memorandum had been drafted on the case and by August 7, the case was numbered. Thus, contrary to the defendants' contention, the investigation had both impetus and direction prior to the removal of the negatives and paste-ups.

(b) The list of the ten companies was used by the government agents in their audit of the hospitals. As such, if the acquisition of the identities of those companies is found to have been illegally made, the subsequent discovery of the phony invoices in the records of the hospitals can be said to be tainted. Nevertheless, more than ten phony companies were involved in the defendants' scheme and the conspiracy involved more than one modus operandi.

An audit of the hospitals did not result from the information obtained by the seizure of the negatives and paste-ups. The government agents had already been told of the political printing and of the use of phony invoices. An audit of the hospitals was the next logical step. The discovery of the ten companies made the acquisition of the relevant evidence as to those companies easier, but cannot be said to have infected the larger amount of other information obtained from the audits.

There were, in the hospital records, significant clues indicating which of the items were relevant to the investigation. Some person had previously placed red markings

on the memorandum copies of certain checks, which signalled that they may have been used for questionable purposes. Likewise, the "non-computer checks" which left the hospitals signed solely by Ollendorf and Evans were automatically suspect.

Consequently, despite the discovery of the identity of the ten companies, the audits of the hospitals were not a result of that discovery but were due to prior validly obtained information. The audits were an independent source of information as to the various schemes involved herein.

(c) Zunich was also an independent source of the evidence submitted at trial. He told his story as a matter of free will. He clearly was thoroughly familiar with the activities of the defendants, and with their methods of concealing their operations. While the defendants argue that Zunich would not have become a government witness but for the IRS summons of the hospitals, this is largely conjecture. It has been noted above that the audits of the hospitals cannot be said to have been caused by the discovery of the identity of the ten companies.

*III. C. Additional Arguments of Defendant Schiffman.*

1. Confrontation.

 Defendant Schiffman contends that, except for Zunich's testimony as to statements by co-defendants Cella and Evans, there is no evidence of his criminal intent or knowledge of a criminal scheme. He further argues that the testimony of Zunich as to the co-defendants' statements should have been excluded pursuant to the Sixth Amendment's Confrontation Clause as interpreted by *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) and *United States v. Adams,* 446 F.2d 681 (9th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971).

There is clearly enough evidence, wholly apart from Zunich's testimony as to the statements by the co-defendants, of Schiffman's knowledge and criminal intent. There are statements by Zunich in the record of discussions with Schiffman as to the falsity of the invoices which Schiffman was submitting. Likewise, Schiffman was shown to be an active participant in the conspiracy—setting up bank accounts for sham companies, depositing checks into those accounts and then writing checks for the political and personal purposes of Cella, submitting false invoices to Ray for duplication and picking some of them up, asking a supplier of political paraphernalia to alter his invoices to delete the true nature of the purchase, etc., etc.

In addition, it is clear that Zunich's testimony as to statements by co-conspirator Cella concerning Schiffman's knowledge and intent would be admissible under the rule established in *Dutton, supra,* 400 U.S. at 88–89, 91 S.Ct. 210, and as adopted by this court, *United States v. Wood,* 550 F.2d 435, 442 (9th Cir. 1976); *United States v. Snow,* 521 F.2d 730, 734 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976).

III. C.

2. *Government misconduct.*

 It is urged that the government misconduct in the investigation of this case was so egregious as to warrant a reversal of the convictions herein. We note that the trial court did consider the allegations of government misconduct and did find conduct which he did not condone; he nevertheless did not find sufficient misconduct to warrant the radical remedy urged by the defendants. After reviewing the record, we agree with his conclusion on this matter.

*III. D. Additional Argument of Defendant Evans.*

1. Sufficiency of evidence against Evans.

 Prior to the time he became administrator at Mercy Hospital, Evans was frequently informed by Ollendorf of the problems the latter was having at Mission Hospital due to the unlawful activities of Cella. Armed with this knowledge Evans, nevertheless, became directly involved with

the printing of false invoices and later with the submission of false invoices to Mercy Hospital. Evans frequently avoided the normal check acquisition process to obtain checks for sham companies. Evans, himself, obtained checks from the petty cash account at Mercy Hospital in order to make political contributions. He was informed, on more than one occasion, by Podruski that his actions were not proper. The above evidence is sufficient to support Evans' conviction on the conspiracy count. The affirmance of the conspiracy conviction makes it unnecessary under the concurrent sentence rule to consider the question of sufficiency of evidence of the substantive counts. *United States v. Carpio*, 547 F.2d 490, 492 (9th Cir. 1976); *United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir. 1976). Without going into detail, however, we have examined the evidence and found it to be sufficient as to the substantive counts to convict.

2. Conviction under 18 U.S.C. § 1001.

 Defendant Evans argues that there was insufficient evidence to show that he knew that the false entries which he allegedly made in the hospital records would ultimately be used as a basis for reimbursement from the government. Evans' position is untenable as it requires an assumption that, even though he was the administrator of Mercy Hospital, Evans was ignorant of the fact that the hospital's record of expenses would eventually be used to prepare income tax returns for the hospitals and Medicare reimbursement reports to the government. Such an assumption cannot logically be made. Furthermore, it is clear from the record that Ollendorf discussed with Evans the potential liability for signing a Medicare Cost Reimbursement Report (which would contain an amount of non-hospital related expenses), which were recorded on the hospital records as proper expenses.

3. Multiplicity.

Given that Evans received concurrent sentences, we need not, and do not, reach his contention that five of the substantive counts are multiplicious. *Carpio, supra,* 547 F.2d at 492; *United States v. Westover*, 511 F.2d 1154, 1155 (9th Cir.), *cert. denied*, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975).

4. Severance.

 The granting or denial of a severance under Rule 14 of the FRCrimP is a matter within the trial court's discretion. Reversal is appropriate only in cases where an abuse of discretion is shown. *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *United States v. Kaplan*, 554 F.2d 958, 966 (9th Cir. 1977). The test is whether a joint trial was so prejudicial to a defendant as to require the exercise of the trial judge's discretion in but one way. *United States v. Campanale*, 518 F.2d 352, 359 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). The burden of proof rests on the moving party, and is a difficult one to meet: i. e., the defendant must show more than the fact that a separate trial might offer him "a better chance" of acquittal. *Id.*

Evans argues that he was tainted by the trial with co-defendant Cella who is described as a "thief of astounding proportion." We note that the trial was not before a jury but before an experienced trial judge. We do not find the charge of possible "guilt by association" to be sufficient to establish the requisite prejudice. Likewise, Evans refers to his belief prior to trial that Cella would testify as to his (Evans) lack of knowledge. However, at that time Cella had not made up his mind on whether he was going to waive his Fifth Amendment rights and testify at the trial. As it happened, he did not.

IV. CONCLUSION.

The convictions of the three appellants are affirmed as to each and all of the respective counts against them.